{¶ 1} Defendant-appellant, Eddie Lamont Bandy, appeals from a Mahoning County Common Pleas Court judgment convicting him of rape, following a jury trial, and his resulting sentence.
 {¶ 2} On October 4, 2000, 14-year-old Stephanie was walking home from Hillman School through Belleview Park when a man approached her. He began to talk to her and asked her if he could kiss her. She refused and the man then grabbed her. The two struggled for awhile. The man punched Stephanie in the face several times. Then he raped her. When he was finished, the man simply walked away and Stephanie ran home.
 {¶ 3} When she returned home, she told her family what had happened and they contacted the police. Stephanie went to the hospital where a rape kit was performed. The doctor and nurse were able to preserve semen found inside Stephanie. The police investigated the matter and came up with a suspect. The suspect's DNA was tested at the Bureau of Criminal Identification and Investigation (BCI) against the DNA evidence retrieved from Stephanie, which revealed that the suspect was not Stephanie's attacker. The scientist at BCI subsequently entered the DNA evidence retrieved from Stephanie into an Ohio database containing DNA profiles. Appellant had had his blood drawn and his DNA profile inputted into the database when he was incarcerated on a previous, unrelated matter. The BCI scientist found that the DNA from the crime could match appellant's DNA.
 {¶ 4} Based on this information, police contacted appellant and asked for a sample of his blood. Appellant gave the blood sample. Upon further testing, it was revealed that only one in 4.134 quintillion people would have the same DNA as appellant, which was the same DNA recovered from Stephanie.
 {¶ 5} On October 11, 2001, a Mahoning County grand jury indicted appellant on one count of rape, a first-degree felony in violation of R.C. 2907.02(A)(2)(B). Appellant waived his right to a speedy trial on December 12, 2001.
 {¶ 6} On July 2, 2002, appellant filed a motion to suppress DNA evidence. The DNA was obtained from appellant when Youngstown police officers took him to *Page 3 
St. Elizabeth Hospital for a blood sample. Appellant alleged that he did not give his consent to this search. The trial court held a hearing on appellant's motion and subsequently overruled it.
 {¶ 7} Appellant filed another motion to suppress on February 5, 2004, this time arguing that the initial taking of his DNA sample when he was previously incarcerated was unconstitutional. The trial court again denied appellant's motion.
 {¶ 8} On October 13, 2004, appellant filed a notice of withdrawal of his speedy trial waiver and a demand for trial. The court held a hearing on October 21, 2004. The court refused to accept appellant's withdrawal stating that he did not have the right to do so because his waiver was "irrevocable."
 {¶ 9} On October 27, 2004, the matter was set to proceed to trial; however, by agreement of both parties, the trial was continued to November 1, 2004. But on November 1, plaintiff-appellee, the State of Ohio, disclosed previously unknown evidence to appellant. This prompted appellant to ask for another continuance, which the court granted.
 {¶ 10} The case ultimately proceeded to a jury trial on March 7, 2005. The jury found appellant guilty as charged. The court then held a sentencing hearing on March 14, 2005. It sentenced appellant to the maximum prison term of ten years and designated him as a sexually oriented offender.
 {¶ 11} Appellant filed a timely notice of appeal on March 22, 2005.
 {¶ 12} Appellant raises five assignments of error and one supplemental assignment of error. They will be addressed out of order for ease of discussion. His first assignment of error states:
 {¶ 13} "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT AND VIOLATED HIS STATUTORY AND CONSTITUTIONAL RIGHTS TO A SPEEDY TRIAL BY OVERRULING HIS NOTICE OF WITHDRAWAL OF WAIVER OF SPEEDY TRIAL AND DEMAND FOR TRIAL."
 {¶ 14} The Sixth Amendment to the United States Constitution guarantees that, "[i]n all criminal prosecutions, the accused shall enjoy the right to a speedy and *Page 4 
public trial." This right was made applicable to the States by theFourteenth Amendment. Article I, Section 10 of the Ohio Constitution also guarantees an accused the right to a speedy trial.
 {¶ 15} Every person who is charged with an offense for which he may be deprived of his liberty or property is entitled to this fundamental right of a speedy trial. State v. Dunlap, 7th Dist. No. 01-CA-124, 2002-Ohio-3178, at ¶ 10. This is so because the right to speedy trial "`is premised upon the reality that fundamental unfairness is likely in overlong prosecutions.'" State v. Anderson, 7th Dist. No. 02-CO-30, 2003-Ohio-2557, at ¶ 13, quoting Dickey v. Florida (1970), 398 U.S. 30,54, 90 S.Ct. 1564, 26 L.Ed.2d 26.
 {¶ 16} But an accused may waive his right to a speedy trial. "`Following an express, written waiver of unlimited duration by an accused of his right to speedy trial, the accused is not entitled to a discharge for delay in bringing him to trial unless the accused files a formal written objection and demand for trial, following which the state must bring the accused to trial within a reasonable time.'" State v.Shakoor, 7th Dist. No. 01-CA-121, 2003-Ohio-5140, at ¶ 10, quotingState v. O'Brien, 34 Ohio St.3d 7. paragraph two of the syllabus.
 {¶ 17} In this case, appellant filed an express, written speedy trial waiver on December 12, 2001, which stated that he "irrevocably" waived his right to a speedy trial. Several years passed, and then, on October 13, 2004, appellant filed a notice of withdrawal of his speedy trial waiver and a demand for trial. The court held a speedy trial hearing on October 21, 2004. The court pointed out that appellant's speedy trial waiver stipulated that the waiver was "irrevocable" and that the court had informed him that he could not take it back. Furthermore, the court noted that appellant had requested at least ten continuances and was responsible for most of the delay in bringing this matter to trial due to his pursuit of independent DNA testing. The court also noted that the trial was scheduled to start in six days, so it was of little consequence whether it permitted appellant to withdraw his waiver. The court ultimately refused to accept appellant's withdrawal stating that he did not have the *Page 5 
right to do so because his waiver was "irrevocable."
 {¶ 18} Appellant argues that even given the fact that his waiver stated that it was "irrevocable," he was nonetheless entitled to revoke it and demand a trial. Appellant is correct.
 {¶ 19} In State v. Love, 7th Dist. No. 02-CA-245, 2006-Ohio-1762, the defendant also executed a speedy trial waiver that stated that it was "irrevocable." Almost three years later, on July 11, 2002, the defendant filed a pro se motion to revoke his speedy trial waiver. The trial court addressed the defendant's motion at a hearing and stated that it would have to set the trial down "expediently." The defendant's trial began on November 4, 2002, less than four months after he filed his motion to withdraw his speedy trial waiver.
 {¶ 20} The defendant appealed arguing that he was denied his right to a speedy trial. This court found that although the defendant clearly indicated that he wanted to revoke his speedy trial waiver, his attempt to withdraw the waiver did not include a demand for trial. Id. at ¶ 134. Therefore, his waiver was still in effect because he did not follow the law as set forth in O'Brien, supra. Id. However, we went on to determine what the effect would be if the defendant had filed a demand for trial along with his motion to revoke his speedy trial waiver. We stated that, assuming the defendant's revocation was valid, he was subsequently brought to trial within a reasonable time pursuant to O'Brien — 116 days after he filed the motion to withdraw his speedy trial waiver. Id. at ¶ 135. Never once did we mention or suggest that the fact that the defendant's waiver stated that it was "irrevocable" made it so. Instead we presumed that had the defendant filed a proper motion to revoke his waiver along with a demand for trial pursuant to O'Brien, he would have been entitled to such.
 {¶ 21} O'Brien states that if an accused files a formal written objection and demand for trial, the state must bring the accused to trial within a reasonable time. It makes no mention that the initial waiver must have been revocable. Thus, in this case, the trial court should have allowed appellant to revoke his speedy trial waiver. *Page 6 
 {¶ 22} However, such error is harmless. But before an error of constitutional dimension may be deemed harmless, a reviewing court must conclude that the error was harmless beyond a reasonable doubt.State v. Coyle (March 15, 2000), 4th Dist. No. 99-CA-2480, citingChapman v. California (1967), 386 U.S. 18, 24, 87 S.Ct. 824,17 L.Ed.2d 705; State v. Williams (1983), 6 Ohio St.3d 281, 452 N.E.2d 1323, paragraph three of the syllabus. This error is harmless beyond a reasonable doubt because the state brought appellant to trial within a reasonable time after he filed his motion to withdraw his waiver and demand for trial.
 {¶ 23} Appellant filed his motion on October 13, 2004. The trial court held the hearing on the motion on October 21. Thus, had the court allowed appellant to withdraw his speedy trial waiver, the state would have had to bring appellant to trial within a reasonable time from October 21, 2004. Appellant's trial began on March 7, 2005 — 138 calendar days after the court should have accepted his demand for trial. As noted above, we found in Love that 116 calendar days would have been a reasonable time within which to bring the defendant to trial after he revoked his speedy trial waiver. Here, the state waited only 22 days longer.
 {¶ 24} Furthermore, the subsequent delay in bringing appellant to trial was agreed to by the parties. The court initially called the case for trial on November 1, 2004. However, the state revealed that it had just uncovered evidence previously unknown to it or appellant. The state immediately informed appellant. Appellant subsequently requested a continuance to investigate the new evidence. Thus, the trial court continued the trial until March 2, 2005. In a February 23, 2005 judgment entry, the court stated that the parties met for a pretrial conference and agreed that the trial would proceed on March 7, 2005, which it did. Therefore, the state brought appellant to trial within a reasonable time following his attempt to revoke his speedy trial waiver and his demand for trial. The aforementioned events could also be considered a proper tolling of the speedy trial time that brought appellant to trial well within the 90-day statutory time.
 {¶ 25} Accordingly, appellant's first assignment of error is without merit. *Page 7 
 {¶ 26} Appellant's second assignment of error states:
 {¶ 27} "APPELLANT WAS DENIED A FAIR TRIAL WHEN THE TRIAL COURT ABUSED ITS DISCRETION AND OVERRULED HIS MOTION TO SUPPRESS THE RESULTS OF DNA OR LABORATORY TESTS PERFORMED ON SAMPLES OF HIS BLOOD CONTRARY TO THE PROTECTION OF THE FOURTH AMENDMENT."
 {¶ 28} In the investigation of this case, another individual was originally a suspect. BCI compared the DNA from the suspect's blood to samples recovered as evidence in the victim's rape kit, which included DNA from the rapist. The test excluded the original suspect as the attacker. BCI then tested the DNA profile from the rape kit against samples contained in an FBI database prepared from samples taken from prisoners while incarcerated. That test revealed a match with appellant's DNA, which had been taken while he was in prison on another charge (first blood sample).
 {¶ 29} Based on this information, Officer William Rafferty contacted appellant's parole officer, Patrick Sylvester, to speak with appellant. Appellant subsequently had his blood drawn at St. Elizabeth's Hospital (second blood sample) so that further DNA tests could be performed.
 {¶ 30} Appellant argues that his second blood sample was taken without his consent, and therefore, the trial court should have suppressed the results of the DNA test performed on that sample. He contends that prior to taking his blood sample, no one informed him that he was a suspect in a rape case, nor did they advise him of his Fourth Amendment rights to refuse the test. He contends that the only reason he consented to the blood sample was because Sylvester and the police asked him to and, because he was on parole, he had to do what they asked of him. Appellant argues that there was no emergency to obtain his blood sample, and therefore, the police should have secured a warrant to do so.
 {¶ 31} In reply, appellee argues that the trial court correctly found that appellant consented to the drawing of his blood. It notes that no case law required *Page 8 
the police to inform appellant why they wanted his blood sample. Furthermore, appellee points out that the police informed appellant that they were conducting an investigation and that they wanted his blood sample as a part of this investigation. Finally, it argues that appellant read and signed the consent form and that the police informed he did not have to consent.
 {¶ 32} Our standard of review with respect to a motion to suppress is first limited to determining whether the trial court's findings are supported by competent, credible evidence. State v. Winand (1996),116 Ohio App.3d 286, 288, 688 N.E.2d 9, citing Tallmadge v. McCoy (1994),96 Ohio App.3d 604, 608, 645 N.E.2d 802. Such a standard of review is appropriate as, "[i]n a hearing on a motion to suppress evidence, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate the credibility of witnesses." State v. Venham (1994), 96 Ohio App.3d 649, 653,645 N.E.2d 831. An appellate court accepts the trial court's factual findings and relies upon the trial court's ability to assess the witness's credibility, but independently determines, without deference to the trial court, whether the trial court applied the appropriate legal standard. State v. Rice (1998), 129 Ohio App.3d 91, 94, 717 N.E.2d 351. A trial court's decision on a motion to suppress will not be disturbed when it is supported by substantial credible evidence. Id.
 {¶ 33} The trial court made the following findings. After finding out that the DNA sample sent to BCI did not match the initial suspect's DNA but instead matched appellant's DNA, Rafferty contacted appellant's parole officer. When appellant reported to Sylvester's office for a scheduled meeting, Sylvester informed Rafferty that appellant was there. Rafferty and Officer Alice Garro went to Sylvester's office to meet with appellant. When they arrived, they gave appellant a consent form that would allow them to take his blood sample. Appellant read through the form, was asked if he had read it, to which he answered in the affirmative, and then signed the form. The trial court found that appellant's consent was knowingly, voluntarily, and intelligently made and was not the result of compulsion or duress. Thus, the court *Page 9 
overruled appellant's motion to suppress.
 {¶ 34} The Fourth Amendment protects citizens from unreasonable searches and seizures. Maryland v. Buie (1990), 494 U.S. 325, 331,110 S.Ct. 1093, 108 L.Ed.2d 276. Warrantless searches are per se unreasonable unless they fall within an exception to a search warrant.Katz v. U.S. (1967), 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576.
 {¶ 35} Consent is a valid exception. State v. Ludington (Aug. 28, 2000), 7th Dist. No. 99-CO-13; Schneckloth v. Bustamonte (1973),412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854. "To rely on the consent exception of the warrant requirement, the state must show by `clear and positive' evidence that the consent was `freely and voluntarily' given."State v. Posey (1988), 40 Ohio St.3d 420, 427, 534 N.E.2d 61, quotingBumper v. North Carolina (1968), 391 U.S. 543, 548, 88 S.Ct. 1788,20 L.Ed.2d 797. Clear and positive evidence is not significantly different from clear and convincing evidence, which is the amount of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the allegations to be proved. State v. Ingram (1992),82 Ohio App.3d 341, 346, 612 N.E.2d 454. Whether the defendant gave consent voluntarily, as opposed to being coerced or placed under duress, is a question of fact to be determined by the totality of the circumstances. Ludington, 7th Dist. No. 99-CO-13; Schneckloth,412 U.S. at 227.
 {¶ 36} The record supports the court's findings. Rafferty, Garro, and Sylvester testified to the following.
 {¶ 37} Rafferty testified that a BCI scientist contacted him by letter notifying him that although the DNA sample that the Youngstown Police had sent from a potential suspect did not match that found in the evidence taken from Stephanie, it did match another DNA profile in her system. (Sup. Tr. 8). That match was appellant. (Sup. Tr. 8). The BCI scientist recommended that Rafferty obtain an updated blood test from appellant. (Sup. Tr. 8). So Rafferty contacted Sylvester, appellant's parole officer, and informed him of the situation. (Sup. Tr. 9). Sylvester then called Rafferty when appellant showed up at his office. (Sup. Tr. 10). *Page 10 
Sylvester informed appellant that the officers were there to talk to him about a new offense. (Sup. Tr. 41). Appellant agreed to talk to them. (Sup. Tr. 41).
 {¶ 38} The officers explained to appellant that they were conducting an investigation and that they would like a blood sample from him. (Sup. Tr. 12, 33, 35). Appellant did not ask what they were investigating and they did not tell appellant that they were investigating a rape. (Sup. Tr. 12, 17). Rafferty then gave appellant a consent form, which Rafferty read into the record:
 {¶ 39} "Having been informed of my Constitutional Right not to have a search made of my person to obtain the following physical material and substances without a search warrant being obtained from a court and signed by a judge, and my right to refuse to consent to a search without such search warrant, hereby authorize and consent that the Youngstown Police Department, Youngstown, Ohio, through the Youngstown City Physician or his designate, obtain from my body the following: 1) Blood specimen." (Sup. Tr. 11).
 {¶ 40} Rafferty stated that he normally would have the person read the first line or so out loud and then have the person read the rest to himself. (Sup. Tr. 11, 19). He stated that appellant asked if he had to sign the form. (Sup. Tr. 12). Rafferty told him that he did not have to sign it. (Sup. Tr. 12). And Garro stated that appellant appeared to understand the consent form. (Sup. Tr. 26). She also testified that appellant asked if he had to submit to the blood test, to which she responded "no." (Sup. Tr. 26). Rafferty and Garro stated that appellant did consent and did sign the form while at Sylvester's office. (Sup. Tr. 11-12, 27). Sylvester also signed the form as a witness. (Sup. Tr. 43). Sylvester stated that appellant appeared to understand what was happening and no one threatened to arrest him or violate his parole if he refused to consent. (Sup. Tr. 43).
 {¶ 41} Rafferty and Garro then took appellant to have his blood drawn. They both stated that appellant was never in custody, was not handcuffed, was not threatened, appeared coherent, did not appear to be under the influence of drugs or alcohol, and could understand English. (Sup. Tr. 14, 26, 28). Sylvester stated that *Page 11 
when he left, appellant had a "confident, you can take my blood specimen, I don't have nothing to hide, attitude." (Sup. Tr. 51). Appellant's blood was taken at the hospital. (Sup. Tr. 14). Rafferty and Garro then asked appellant where he wanted them to drop him off at. (Sup. Tr. 15, 28-29). Appellant asked to go to the bus station, so the officers dropped him off there. (Sup. Tr. 15, 28-29). When they dropped him off, the officers told appellant that if he had any questions or wanted to know more about the investigation, he could contact them. (Sup. Tr. 37).
 {¶ 42} Appellant also testified at the suppression hearing. He stated that he went to Sylvester's office for a regular visit and Rafferty and Garro showed up. They told him that they needed a blood sample. (Sup. Tr. 56). He stated that he asked them why and they refused to tell him. (Sup. Tr. 56). Appellant also stated that the officers did not show him the consent form until they got to the hospital and that he did not sign the consent form at Sylvester's office. (Sup. Tr. 58). Appellant also stated that Rafferty threatened to arrest him and that he felt threatened. (Sup. Tr. 62-63).
 {¶ 43} Appellant further testified that when he was given the consent form, he briefly looked at it but did not really understand it. (Sup. Tr. 64). He claimed that no one told him that he did not have to sign it. (Sup. Tr. 64). He also stated that no one informed him that he was giving up his right to require the officers to get a search warrant to draw his blood. (Sup. Tr. 65-66).
 {¶ 44} The testimony supports the trial court's factual findings. Rafferty, Garro, and Sylvester gave corroborating accounts of what happened before appellant gave his blood sample. They all stated that appellant was informed that the police were conducting an investigation and that they needed his blood sample. They all agreed that appellant asked if he had to consent to the test and was told that he did not. They all agreed that appellant signed the consent form at Sylvester's office and appeared to understand it. They all agreed that appellant was not pressured or threatened into consenting to the blood test. While appellant's account of what happened was somewhat different, the court had three witnesses who all *Page 12 
testified as to the same events and only one witness, appellant, who gave a different account.
 {¶ 45} Furthermore, appellant gave testimony that indicated he would be able to understand the consent form and the request for the blood test. Appellant testified that he earned B's and C's in school. (Sup. Tr. 64). He also stated that he has had numerous contacts with the police and had been incarcerated for seven-and-a-half years. (Sup. Tr. 67-68). And he stated that he has had experience with doctors performing tests on him. (Sup. Tr. 69). Therefore, appellant should have been able to read and comprehend the consent form, comprehend that the police were conducting an investigation, and understand what was involved in a blood test.
 {¶ 46} Given the totality of the circumstances, the trial court correctly concluded that appellant gave his consent to have his blood drawn voluntarily and not under duress. Accordingly, appellant's second assignment of error is without merit.
 {¶ 47} Appellant's third assignment of error states:
 {¶ 48} "THE COMPULSORY COLLECTION OF APPELLANT'S BLOOD SAMPLE WHILE INCARCERATED PURSUANT TO R.C. 2901.07 VIOLATED APPELLANT'S RIGHT AGAINST UNLAWFUL SEARCH AND SEIZURE AS PROTECTED BY THE FOURTEENTH AMENDMENT."
 {¶ 49} Here appellant argues that the blood sample that was taken from him while in prison (first blood sample) was an illegal seizure done without his consent. He contends that R.C. 2901.07, the statute that provides for the DNA testing of certain criminals, is unconstitutional. It provides in part:
 {¶ 50} "Regardless of when the conviction occurred or the guilty plea was entered, a person who has been convicted of, is convicted of, has pleaded guilty to, or pleads guilty to a felony offense and who is sentenced to a prison term or to a community residential sanction in a jail or community-based correctional facility for that offense * * *, and a person who has been convicted of, is convicted of, has pleaded guilty to, or pleads guilty to a misdemeanor offense listed in division (D) of *Page 13 
this section and who is sentenced to a term of imprisonment for that offense shall submit to a DNA specimen collection procedure administered by the director of rehabilitation and correction or the chief administrative officer of the jail or other detention facility in which the person is serving the term of imprisonment." R.C. 2901.07(B)(1).
 {¶ 51} Appellant notes that, pursuant to the Fourth Amendment, searches must be reasonable. He contends that the blood test and DNA analysis performed on his blood were done so without his consent and without any individualized suspicion of criminal wrongdoing. Therefore, he contends that the trial court should have granted his motion to suppress the DNA evidence on this basis.
 {¶ 52} On the other hand, appellee argues that the taking of appellant's blood was reasonable under the circumstances. It contends that where a defendant's privacy interests are minimal and where the search furthers an important governmental interest, a search is reasonable despite a lack of individualized suspicion.
 {¶ 53} The trial court determined that appellant should have filed his motion to suppress as a declaratory judgment action and notified the Ohio Attorney General because what he sought was a declaration that R.C.2901.07 is unconstitutional. Because appellant did not notify the Ohio Attorney General as is required by the declaratory judgment statute, the trial court determined that it did not have jurisdiction to declare R.C.2901.07 unconstitutional. But the court went on to explain that if it had jurisdiction, it would find that R.C. 2901.07 is constitutional based on the logic set out in State v. Steele, 155 Ohio App.3d 659,802 N.E.2d 1127, 2003-Ohio-7103.
 {¶ 54} Both the First and Second Districts have addressed R.C.2901.07's constitutionality. Both have determined that the statute does not violate the Fourth Amendment and is constitutional, but they each used a different analysis to reach this conclusion.
 {¶ 55} In Steele, supra, the defendant argued that the taking of DNA samples *Page 14 
without any individualized suspicion of wrongdoing violated hisFourth Amendment rights. The First District observed that all 50 states have enacted DNA database statutes and courts have almost uniformly held that these statutes do not violate the Fourth Amendment. Id. at ¶ 29. It further observed that courts have taken one of two approaches in arriving at this conclusion. Id.
 {¶ 56} The first approach involves a traditional Fourth Amendment analysis where the court weighs both the offender's lowered expectation of privacy and the minimally intrusive nature of a blood draw against the government's interest in creating a DNA database to solve future crimes. Id. at ¶ 30, citing Johnson v. Commonwealth (2000), 259 Va. 654,671-72, 529 S.E.2d 769; Doles v. State (Wyo. 1999), 994 P.2d 315,318-19; In re Maricopa (1997), 187 Ariz. 419, 422-24, 930 P.2d 496,500-501; L.S. v. State (Fla.App.2001), 805 So.2d 1004, 1007-1008;Cooper v. Gammon (Mo.App.1997), 943 S.W.2d 699, 704-705; State ex rel.Juv. Dept. of Multnomah Cty. v. Orozco (1994), 129 Ore.App. 148, 151-54,878 P.2d 432.
 {¶ 57} The second approach applies the "special needs" doctrine, which allows searches and seizures without a warrant and without individualized suspicion. Id. at ¶ 31, citing Gaines v. State (2000),116 Nev. 359, 368, 998 P.2d 166; Landry v. Atty. Gen. (1999),429 Mass. 336, 344-45, 709 N.E.2d 1085; People v. Wealer (1994), 264Ill.App.3d 6, 10-13, 201 Ill.Dec. 697, 636 N.E.2d 1129. Under this approach, as long as a government interest exists beyond the need to procure criminal convictions, governmental special needs can be enough to eliminate the requirement of probable cause or individualized suspicion of wrongdoing. Id. at ¶ 32.
 {¶ 58} The First District determined that courts should apply a two-part test combining the above two approaches, as used by federal courts addressing the issue. Id. at ¶ 41. It then applied this two-part test.
 {¶ 59} First, the court determined that R.C. 2901.07 meets the special needs test. It reasoned that DNA statutes are not designed to discover evidence of a person's criminal wrongdoing. Id. at ¶ 43. But instead, a DNA sample is only evidence of a person's genetic code, which, on its own, does not show the *Page 15 
commission of a crime. Id. Furthermore, the court noted that searches conducted pursuant to DNA statutes have two purposes that go beyond the normal need for law enforcement: (1 ) "the searches contribute to the creation of a more accurate criminal justice system;" and (2) "the searches allow for a more complete database, which will assist law enforcement agencies in solving future crimes that have not yet been committed." Id. at ¶ 44. Thus, the court concluded that because the primary purpose authorized by R.C. 2901.07 goes beyond the needs of ordinary law enforcement, it meets the special needs test. Id. at ¶ 46.
 {¶ 60} Second, the court determined that R.C. 2901.07 also meets the balancing test weighing the reasonableness of the intrusion into an individual's privacy against the government's special need. It pointed out that the United States Supreme Court has found that the taking of one's blood sample is minimally intrusive on a person's privacy. Id. at ¶ 48, citing Skinner v. Ry. Labor Executives' Assn. (1989),489 U.S. 602, 625, 109 S.Ct. 1402, 103 L.Ed.2d 639. It also noted, however, that the taking of DNA samples includes the additional intrusion of the exposure of personal information reflected in the DNA. Id. The court also pointed out that prisoners have a diminished expectation of privacy. Id. at ¶ 49, citing Griffin v. Wisconsin (1987), 483 U.S. 868,874, 107 S.Ct. 3164, 97 L.Ed.2d 709; Hudson v. Palmer (1984),468 U.S. 517, 524-528, 104 S.Ct. 3194, 82 L.Ed.2d 393; In re Nicholson (1999),132 Ohio App.3d 303, 309, 724 N.E.2d 1217; Pollock v. Brigano (1998),130 Ohio App.3d 505, 511, 720 N.E.2d 571. It then reasoned:
 {¶ 61} "A convicted felon's interest in the identifying information contained in his or her DNA is particularly weak when compared with those of other individuals. In the context of law enforcement, the taking of a DNA sample is akin to the taking of a fingerprint and does not unduly infringe on an offender's privacy interests." (Citations omitted.) Id.
 {¶ 62} Based on this reasoning, the court held that the search authorized by R.C. 2901.07 is reasonable and that the taking of a blood sample for inclusion in the DNA database without individualized suspicion does not violate the *Page 16 Fourth Amendment. Id. at ¶ 50.
 {¶ 63} The Second District took a different approach in State v.Cremeans, 160 Ohio App.3d 1, 825 N.E.2d 1124, 2005-Ohio-928. The defendant raised substantially the same argument, asserting that R.C.2901.07 was unconstitutional because it allowed the taking of his blood sample without his consent and without individualized suspicion of criminal wrongdoing.
 {¶ 64} The court acknowledged the two-part approach taken inSteele and in other cases. Id. at ¶ 26. It then noted that other courts have found DNA statutes constitutional by applying a "pure totality-of-the-circumstances or traditional balancing-of-interests test." Id. at ¶ 27; Groceman v. U.S. Dept. of Justice (C.A.5, 2004),354 F.3d 411; United States v. Kincade (C.A.9, 2004), 379 F.3d 813, 832-39;Boling v. Romer (C.A.10, 1996), 101 F.3d 1336, 1340. It pointed out that courts taking this approach have found that a prisoner's diminished expectation of privacy, particularly as to his identity, is a key fact that eliminates the need for individualized suspicion of wrongdoing. Id.
 {¶ 65} The court then concluded:
 {¶ 66} "Having reviewed the two competing analytical approaches to assessing the constitutionality of DNA-testing statutes, we cast our lot with those courts employing a straight totality-of-the-circumstances or balancing-of-interests approach without regard to whether R.C. 2901.07
serves some special need beyond normal law enforcement. While not precluding the possibility that Ohio's statute might survive scrutiny under the special-needs doctrine, we agree with the Ninth Circuit Court of Appeals' recent conclusion that reliance on a pure totality-of-the-circumstances reasonableness analysis to uphold mandatory DNA testing of convicted offenders `both comports with the Supreme Court's recent precedents and resolves this appeal in concert with the requirements of the Fourth Amendment.' Kincade, supra,379 F.3d at 832.
 {¶ 67} "But regardless of whether we interpret R.C. 2901.07 as serving some special need distinct from ordinary law enforcement, as the trial court did, or whether *Page 17 
we perceive the statute as furthering a traditional law-enforcement objective, the conclusion is the same: the compelled extraction of Cremeans's blood or saliva for DNA analysis does not violate hisFourth Amendment rights. Under the special-needs approach, a key consideration in the Fourth Amendment balancing of interests is a finding that the DNA analysis is being conducted primarily for non-law-enforcement purposes. On the other hand, under the pure totality-of-the-circumstances approach that we favor, an inmate's reduced expectation of privacy is a paramount consideration when balancing competing interests to find the DNA testing reasonable under the Fourth Amendment.
 {¶ 68} "As one appellate court astutely has observed, however, `[r]egardless of which analytic approach we follow, we see a common thread that leads to the conclusion the Fourth Amendment is not offended by the statute. Incarcerated felons have a substantially diminished expectation of privacy. The testing, by needle or swab, is minimally intrusive. The State is not investigating a particular or specific crime. It is conducting a technologically accurate identification procedure that will enhance the administration of justice — reaching back to solve past crimes and extending forward to identify future offenders, convicting the guilty and acquitting the innocent.'[State v.] Peppers * * * [(2004)], 352 Ill.App.3d [1002] at 1007, 288 Ill.Dec. 502, 817 N.E.2d 1152. We agree with this assessment. Consequently, based on the reasoning and citation of authority set forth above, we hold that R.C. 2901.07, which requires DNA testing of offenders sentenced to incarceration, does not violate Cremeans'sFourth Amendment right to be free from unreasonable searches. As a result, the trial court did not err in overruling his motion to suppress the DNA results from his 1998 blood test." Id. at ¶ 37-39.
 {¶ 69} Based on Steele, Cremeans, and the authority cited within those cases, it is clear that R.C. 2901.07 is constitutional. Whichever approach is taken, the result is the same. Even assuming that appellant properly attacked the constitutionality of a statute, R.C. 2901.07 does not violate appellant's right to be free from unreasonable searches and seizures. The trial court properly overruled appellant's *Page 18 
motion to suppress the results of his first blood test. Accordingly, appellant's third assignment of error is without merit.
 {¶ 70} Appellant's fifth assignment of error states:
 {¶ 71} "THE COURT DENIED APPELLANT DUE PROCESS UNDER THEFOURTEENTH AMENDMENT DUE TO THE FACT HIS CONVICTION FOR RAPE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE AND THE JURY'S VERDICT WAS INCONSISTENT WITH THE EVIDENCE AND TESTIMONY PRESENTED AT TRIAL."
 {¶ 72} Appellant claims here that his conviction was against the manifest weight of the evidence. He points out that the victim was unable to identify him as her attacker despite her detailed description to police. He notes that she failed to pick him out of a photographic lineup. He further points out that he was not identified as an initial suspect in the rape.
 {¶ 73} In determining whether a verdict is against the manifest weight of the evidence, an appellate court must review the entire record, weigh the evidence and all reasonable inferences and determine whether, in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. State v. Thompkins (1997),78 Ohio St.3d 380, 387, 678 N.E.2d 541. "Weight of the evidence concerns `the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other.'" Id. (Emphasis sic.) In making its determination, a reviewing court is not required to view the evidence in a light most favorable to the prosecution but may consider and weigh all of the evidence produced at trial. Id. at 390.
 {¶ 74} Still, determinations of witness credibility, conflicting testimony, and evidence weight are primarily for the trier of the facts.State v. DeHass (1967), 10 Ohio St.2d 230, 227 N.E.2d 212, paragraph one of the syllabus.
 {¶ 75} The jury convicted appellant of rape in violation of R.C.2907.02(A)(2), which provides: "No person shall engage in sexual conduct with another when the *Page 19 
offender purposely compels the other person to submit by force or threat of force."
 {¶ 76} Appellant argues that despite giving police a detailed description of her attacker, Stephanie was unable to pick him out of a photo lineup. He points out that she testified that the man who attacked her was a black male, five-foot-nine to six-foot tall, clean shaven with a short afro, wearing a green sweatshirt, stone-washed jeans, and a hat. (Tr. 294). She further stated that her attacker wore green jogging shorts under his jeans and had an earring and a necklace. (Tr. 303). Stephanie further testified that during the rape, she was face to face with her attacker. (Tr. 326-27). Appellant further points out that the police used Stephanie's description of her attacker to search the area for a suspect, and identified one Herbert Cowart as a potential suspect. (Tr. 345, 544). Finally, appellant points out that he was not an initial suspect in this crime. (Tr. 544).
 {¶ 77} But the evidence at trial also revealed the following.
 {¶ 78} Stephanie testified that she was walking home from Hillman School alone through Belleview Park. (Tr. 292-93). Once she was in the park, Stephanie noticed a black man wearing a green sweatshirt, jeans, and a hat walking behind her. (Tr. 294). About halfway through her walk, the man started talking to her. (Tr. 294). He told her his name was Ramone and asked Stephanie if he could kiss her. (Tr. 295). She said "no" and told the man she had to go. (Tr. 295). At that point, the man grabbed her and the two struggled. (Tr. 295). He pushed her through a fence and she fell and hit her head. (Tr. 295-96). Stephanie blacked out for a minute and then got up and started to run. (Tr. 297). The man got a hold of her again. (Tr. 297). He punched her in the face and got her down on the ground. (Tr. 297). He then pulled her pants down, and she pulled them back up. (Tr. 298). This happened approximately five times. (Tr. 301). Stephanie yelled for help and the man threatened to kill her. (Tr. 299). Eventually, the man raped her. (Tr. 301). When he was finished, the man pulled up his pants and walked away and Stephanie walked home. (Tr. 302).
 {¶ 79} When she got home, Stephanie told her family what had happened and *Page 20 
they contacted the police. (Tr. 304). Stephanie was taken to a hospital where a rape kit was performed. (Tr. 305).
 {¶ 80} Additionally, Stephanie stated that she was not able to pick anyone out of a photo lineup as her attacker. (Tr. 329-31).
 {¶ 81} Lynn Bolin, a scientist at BCI, testified regarding the DNA evidence. She stated that the Youngstown Police Department initially submitted samples to BCI from Stephanie and a potential suspect named Hebert Cowart. (Tr. 408-09). Bolin stated that she tested Cowart's DNA sample and compared it to the DNA evidence recovered from Stephanie's rape kit. (Tr. 410-13). Bolin concluded that, to a reasonable degree of scientific certainty, Cowart's DNA was not present in the swabs taken from Stephanie. (Tr. 413-14). Therefore, Cowart was excluded as being the source of the semen found inside of Stephanie. (Tr. 414).
 {¶ 82} Next, Bolin entered the unknown DNA from Stephanie's rape kit into a computer where it was compared against other profiles in the computer database known as the Ohio Index. (Tr. 415-16). The computer database revealed a "hit" and identified appellant (Tr. 417). Consequently, Bolin received a blood sample from appellant to test his DNA. (Tr. 417-18). Bolin's DNA comparison revealed that, to a reasonable degree of scientific certainty, appellant was included in the group that contributed that DNA found inside Stephanie. (Tr. 423). Once she determined that appellant was included, Bolin did a statistical calculation to determine how strong a match appellant's DNA was to that found inside Stephanie. (Tr. 423). She determined that for African Americans, the chances of someone else having the same DNA as appellant, which was found inside of Stephanie, was one in 4.134 quintillion. (Tr. 429, 457).
 {¶ 83} Rafferty testified that Bolin called him and as a result of her phone call, he initiated an investigation into appellant. (Tr. 474). He stated that he asked appellant for a blood sample and appellant complied. (Tr. 475). Rafferty also testified that Stephanie was not able to pick appellant out of a photo lineup as her attacker. (Tr. 479). However, he stated that he presented her with the photo lineup *Page 21 
ten months after the attack. (Tr. 537).
 {¶ 84} Appellant testified in his own defense. He denied being in Belleview Park on the date of the rape. (Tr. 623). He denied ever seeing Stephanie before. (Tr. 624). And most importantly, he denied raping Stephanie. (Tr. 624). However, appellant had no explanation for how his sperm ended up inside of her. (Tr. 640).
 {¶ 85} Appellant argues that "the only evidence which remotely tied" him to this crime was the DNA evidence. However, this was the most important piece of evidence in the entire trial. The DNA evidence established that only one in over four quintillion African Americans would have the same DNA as appellant, which was the same DNA found inside of Stephanie. Despite the fact that Stephanie was unable to identify appellant, the DNA evidence alone overwhelmingly supported the conclusion that appellant was Stephanie's attacker. Thus, we should not conclude that appellant's conviction was against the manifest weight of the evidence. Accordingly, appellant's fifth assignment of error is without merit.
 {¶ 86} Appellant's fourth assignment of error and supplemental assignment of error are related and, therefore, will be addressed together. Appellant's fourth assignment of error states:
 {¶ 87} "THE TRIAL COURT ERRED TO THE PREJUDICE OF APPELLANT BY SENTENCING HIM TO THE MAXIMUM SENTENCE FOR HIS CONVICTION FOR RAPE WITHOUT PROPERLY CONSIDERING OHIO'S SENTENCING STATUTES, BUT RATHER SENTENCING APPELLANT BASED UPON HIS PERSONAL BELIEFS REGARDING APPELLANT'S ACTIONS."
 {¶ 88} Appellant's supplemental assignment of error states:
 {¶ 89} "THE TRIAL COURT ERRED IN RELYING ON THE UNCONSTITUTIONAL FACTORS CONTAINED IN R.C. 2929.14(B)(C) AND 2929.19(B)(2) TO SENTENCE APPELLANT TO THE MAXIMUM SENTENCE OF TEN (10) YEARS HEREIN."
 {¶ 90} In his fourth assignment of error, appellant argues that the trial court erred in failing to follow the statutory sentencing guidelines set out in R.C. *Page 22 2929.14(B)(C). He argues that the court instead relied on its own feelings towards appellant.
 {¶ 91} But appellant filed his brief in this case on March 16, 2006, just a few weeks after the Ohio Supreme Court decided State v.Foster, 109 Ohio St.3d 1, 2006-Ohio-856, 845 N.E.2d 470. InFoster, the Court held several provisions of Ohio's sentencing scheme unconstitutional. Thus, appellant filed a supplemental brief raising aFoster issue with his sentence. Here appellant argues that we must remand his case for resentencing because the trial court relied on certain factors in sentencing him which the Ohio Supreme Court held to be unconstitutional.
 {¶ 92} Appellee concedes error based on Foster and agrees that the appropriate remedy here is a limited remand for resentencing.
 {¶ 93} The trial court sentenced appellant on March 17, 2005.[1] The Ohio Supreme Court decided Foster almost a year later. In sentencing appellant, the trial court relied on two statutory provisions whichFoster held to be unconstitutional. Specifically, the trial court relied on R.C. 2929.14(C)— it found that appellant committed the worst form of the offense and posed the greatest likelihood of recidivism, therefore, the maximum sentence was appropriate. (Sentencing Tr. 24). And the court also relied on R.C. 2929.14(B)(2)— it found that the minimum sentence would demean the seriousness of the offense and would not adequately protect the public. (Sentencing Tr. 23). Foster found both of these provisions unconstitutional. Foster, 109 Ohio St.3d at paragraph one of the syllabus (Apprendi v. New Jersey (2000), 530 U.S. 466,120 S.Ct. 2348, 147 L.Ed.2d 435, and Blakely v. Washington (2004), 542 U.S. 296,124 S.Ct. 2531, 159 L.Ed.2d 403, followed.)
 {¶ 94} The Foster Court went on to hold that those unconstitutional provisions could be severed. Id. at paragraphs two and four of the syllabus. Since the provisions could be severed, "[t]rial courts have full discretion to impose a prison sentence within the statutory range and are no longer required to make findings or give their reasons for imposing maximum, consecutive, or more than the minimum *Page 23 
sentences." Id. at paragraph seven of the syllabus.
 {¶ 95} Here, since the trial court's imposition of a more than minimum sentence was based on R.C. 2929.14(B), and imposition of a maximum sentence was based on R.C. 2929.14(C), which have been found unconstitutional in Foster, appellant's sentence must be reversed accordingly.
 {¶ 96} After Foster, the trial court no longer needs to give reasons or findings prior to imposing maximum, consecutive and/or more than minimum sentences. The Court held that:
 {¶ 97} "These cases and those pending on direct review must be remanded to trial courts for new sentencing hearings not inconsistent with this opinion. We do not order resentencing lightly. Although new sentencing hearings will impose significant time and resource demands on the trial courts within the counties, causing disruption while cases are pending on appeal, we must follow the dictates of the United States Supreme Court. Ohio's felony sentencing code must protectSixth Amendment principles as they have been articulated.
 {¶ 98} "Under R.C. 2929.19 as it stands without (B)(2), the defendants are entitled to a new sentencing hearing although the parties may stipulate to the sentencing court acting on the record before it. Courts shall consider those portions of the sentencing code that are unaffected by today's decision and impose any sentence within the appropriate felony range. If an offender is sentenced to multiple prison terms, the court is not barred from requiring those terms to be served consecutively. While the defendants may argue for reductions in their sentences, nothing prevents the state from seeking greater penalties.United States v. DiFrancesco (1980), 449 U.S. 117, 134-136,101 S.Ct. 426, 66 L.Ed.2d 328."
 {¶ 99} The same day Foster was decided, the Ohio Supreme Court decided a companion case. State v. Mathis, 109 Ohio St.3d 54, 2006-Ohio-855,846 N.E.2d 1. In Mathis, the Court clarified Foster adding:
 {¶ 100} "Although after Foster, the trial court is no longer compelled to *Page 24 
make findings and give reasons at the sentencing hearing since R.C.2929.19(B)(2) has been excised, nevertheless, in exercising its discretion the court must carefully consider the statutes that apply to every felony case. Those include R.C. 2929.11, which specifies the purposes of sentencing, and R.C. 2929.12, which provides guidance in considering factors relating to the seriousness of the offense and recidivism of the offender. In addition, the sentencing court must be guided by statutes that are specific to the case itself." Id. at ¶ 38.
 {¶ 101} Due to the Foster issue and appellant's supplemental assignment of error, his fourth assignment of error is rendered moot. Appellant's supplemental assignment of error has merit.
 {¶ 102} For the reasons stated above, appellant's conviction is hereby affirmed. Appellant's sentence is vacated and the matter is remanded for resentencing consistent with State v. Foster, 109 Ohio St.3d 1,2006-Ohio-856, 845 N.E.2d 470.
Vukovich, J., concurs.
Waite, J., concurs.
[1] It should be noted that appellants counsel objected to a maximum sentence based on Blakely, infra, and United States v. Booker (2005),543 U.S. 220, 125 S.Ct. 738, 160 L.Ed.2d 621. (Sentencing Tr. 9). *Page 1