[Cite as *State v. Hudson*, 2013-Ohio-5529.]

STATE OF OHIO, MAHONING COUNTY

IN THE COURT OF APPEALS

SEVENTH DISTRICT

| | | |
|---|---|---|
| STATE OF OHIO | ) | CASE NO. 11 MA 77 |
| | ) | |
| PLAINTIFF-APPELLEE | ) | |
| | ) | |
| VS. | ) | OPINION |
| | ) | |
| CHARLES HUDSON | ) | |
| | ) | |
| DEFENDANT-APPELLANT | ) | |

CHARACTER OF PROCEEDINGS:     Criminal Appeal from the Court of
                             Common Pleas of Mahoning County,
                             Ohio
                             Case No. 09 CR 1190

JUDGMENT:                    Affirmed.

APPEARANCES:

For Plaintiff-Appellee:      Atty. Paul J. Gains
                             Mahoning County Prosecutor
                             Atty. Ralph M. Rivera
                             Assistant Prosecuting Attorney
                             21 West Boardman Street, 6th Floor
                             Youngstown, Ohio  44503

For Defendant-Appellant:     Atty. Fernando Mack
                             420 Lakeside Place
                             323 W. Lakeside Avenue
                             Cleveland, Ohio 44113

JUDGES:

Hon. Cheryl L. Waite
Hon. Gene Donofrio
Hon. Joseph J. Vukovich

                             Dated:  December 9, 2013

WAITE, J.

{¶1} Appellant Charles Hudson appeals his conviction in the Mahoning County Common Pleas Court for the kidnapping, gross sexual imposition and rape of a minor female child. Appellant argues that his speedy trial rights were violated, that his pre-trial identification should have been suppressed, and that his convictions were against the manifest weight of the evidence. He also argues if his convictions stand, they should have been merged for sentencing purposes. Appellant's four assignments of error are without merit and are overruled. The judgment of the trial court is affirmed.

Factual and Procedural History

{¶2} On October 12, 2009 between 7:00 and 7:10 a.m. a fourteen-year old female child ("M") was walking down Tremble Ave. in Campbell, Ohio, on her way to school. When M reached the intersection of Tremble and 12th St., Appellant appeared from around the corner, grabbed her arm, put a knife to her throat, and told her to be quiet or he would hurt her. (Tr. Vol. II, p. 334.)

{¶3} Appellant compelled M to walk through the Sycamore Apartment parking lot to an abandoned house on 13th St.. (Tr. Vol. II, p. 334.) Once inside the house on 13th St., Appellant forced her up the stairs to a bedroom on the second floor. When they reached the second floor Appellant said to M, "you already know what I want" and M asked him to let her go. (Tr. Vol. II, p. 368.)

{¶4} Appellant held the knife in his hand as he forced his tongue into M's mouth, kissing her. (Tr. Vol. II, pp. 337-338.) M asked him "please stop" and asked him again to let her go. (Tr. Vol. II, p. 338.) Appellant refused and told her "be quiet,

or you're gonna get hurt." (Tr. Vol. II, p. 338.) Appellant then moved M into a room, removed her shirt, and told her to lie on a blanket on the floor near a window. (Tr. Vol. II, p. 338.) Appellant removed M's pants and underwear, touched her thighs, placed the knife within his reach, and forced his penis into her vagina. (Tr. Vol. II, pp. 339-340; 342.)

{¶5} When Appellant finished, he got up and left the room. M kicked the knife away from her, dressed, and ran home. When M entered her house she was crying. She attempted to tell her brother what had happened, but couldn't speak coherently. Her brother shouted for their father and M finally told her parents what happened. The family drove around the neighborhood to see if she could point out her assailant, but Appellant appeared to have left the area. When the family returned home, M showered. M's parents took her to the Campbell Police Department and reported the crime. M then went to the Child Advocacy Center where a rape kit was completed and a medical examination performed.

{¶6} When M gave her report to the police she told them that at some point that morning she lost her glasses. When investigators went to the abandoned house she described, her glasses were located in a second floor bedroom. (Tr. Vol. II, p. 425.) Additional items were recovered from the room including a piece of blue carpet that had bodily fluids on it, a kitchen knife, and a piece of string. The underwear M wore that morning was also retrieved. The house itself burned down a few days after the investigation. Only the photographs taken by the investigators and items recovered from the room remain. (Tr. Vol. III, pp. 471, 477.) The pictures taken of

the room where additional evidence was collected include an image of the words "Bev's house" written in black marker on the windowsill. (Tr. Vol. III, p. 457.)

{¶7} M described the man who attacked her as an older black male, between forty and fifty-nine, with a distinctive walk, who possibly had some facial hair. (Tr. Vol. III, pp. 479-481.) The investigating officer compiled a photographic array using a computer program designed to take images from the BMV. Based on the investigator's belief that, due to M's age, she might perceive men both older and younger than the range she suggested to be in the same twenty-year range, he included men both older and younger than M indicated. (Tr. Vol. III, pp. 479-482.) The investigator included Appellant's image because of M's description of a distinctive walk. Appellant, and his distinctive walk, were known to the investigator. In addition to including Appellant in the array the officer also included the image of a Mr. Beverly who, according to the investigator, commonly went by Bev, based on the words found on the windowsill in the room where M was sexually assaulted. (Tr. Vol. III, p. 483.) M identified Appellant as the man who kidnapped and sexually assaulted her; she re-identified him from the witness stand at trial. (Tr. Vol. II, pp. 483; 343.) After identifying Appellant in the photographic array, M began to cry, but was able to confirm when asked that she was sure he was her assailant. (Tr. Vol. III, p. 484.)

{¶8} Appellant was apprehended the following day in a house where he and another individual were staying. When the police entered the house, the room where Appellant was found was filled with four feet of jumbled household items. Appellant had concealed himself among the items and was so wedged against furniture and

covered with other items that he needed the assistance of the officers to uncover him before he could be taken into custody. (Tr. Vol. II, pp. 451-454.)

{¶9} Analysis of the rape kit revealed semen on the vaginal swabs. The physical examination of M revealed evidence of penetration and blunt force trauma to her genital area. The DNA recovered from the rape kit swabs was matched with Appellant's DNA. (Tr. Vol. II, pp. 417-420.) Appellant stipulated to the contents of and results drawn from the rape kit and acknowledged that his genetic material in the form of semen was collected from M's vagina, but said that the sexual encounter was consensual.

{¶10} Trial began on February 28, 2011 and concluded on March 3, 2011. The jury returned guilty verdicts on all four counts in the indictment: (1) rape, in violation of R.C. 2907.02(A)(2); (2) kidnapping, in violation of R.C. 2905.01(A)(4); (3) kidnapping, in violation of R.C. 2905.01(A)(2); and (4) gross sexual imposition, in violation of R.C. 2907.05(A)(1).

{¶11} At sentencing, the trial court merged the two kidnapping counts. Defense counsel asked that the rape and gross sexual imposition charges also be merged. The state opposed the second merger and emphasized that different instances of contact and conduct had occurred to support the separate charges. The trial judge explained on the record that the court would apply the two-part test articulated in "State versus Lee" "decided, November of 2010" and that in applying the decision, the trial court compared the elements of the offenses and found that a conviction for gross sexual imposition would not "in and of itself convict one of the

charge of rape." (Sentencing Hrg. Tr., pp. 6-7.) For that reason, the trial court found that gross sexual imposition could be committed without committing rape and in this instance would not merge. Appellant filed a timely appeal of his conviction and sentence.

Argument and Law

First Assignment of Error

MR. HUDSON WAS DENIED DUE PROCESS OF LAW AND HIS RIGHT TO A SPEEDY TRIAL WAS VIOLATED WHEN HE WAS NOT BROUGHT TO TRIAL IN A TIMELY MANNER.

**{¶12}** In Ohio, the right to a speedy trial is protected by both federal and state law. The Sixth Amendment to the United States Constitution provides:

> In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defense.

The constitutional speedy trial right "is a more vague concept than other procedural rights." *State v. Davis*, 46 Ohio St.2d 444, 448, 349 N.E.2d 315 (1976); *Barker v. Wingo*, 407 U.S. 514, 521, 92 S.Ct. 2182 (1972). Due to this vagueness, it is "impossible to determine with precision when the right has been denied. We cannot

definitely say how long is too long in a system where justice is supposed to be swift but deliberate." *Id.* "[A]ny inquiry into a speedy trial claim necessitates a functional analysis of the right in the particular context of the case: 'The right of a speedy trial is necessarily relative. It is consistent with delays and depends upon circumstances. It secures rights to a defendant. It does not preclude the rights of public justice." *Id.*, quoting *Beavers v. Haubert*, 198 U.S. 77, 78; 25 S.Ct. 573 (1905).

{¶13} The statutory speedy trial right in Ohio provides: "Upon motion made at or prior to the commencement of trial, a person charged with an offense shall be discharged if he is not brought to trial within the time required by sections 2945.71 and 2945.72 of the Revised Code." R.C. 2945.73(B). Revised Code section 2945.71, titled: "Time for trial" provides "[a] person against whom a charge of felony is pending: * * * (2) Shall be brought to trial within two hundred seventy days after the person's arrest." The statute requires: "[f]or purposes of computing time * * * each day during which the accused is held in jail in lieu of bail on the pending charge shall be counted as three days." R.C. 2945.71(C)(2), (E). The provisions of R.C. 2945.71 and 2945.73, which implement Article I, Section 10 the of Ohio Constitution, relating to the guarantee of an accused's right to a speedy public trial, are mandatory and must be strictly complied with by the state. *Davis*, supra.

{¶14} Although the statute sets a time limit for trial, actions by an accused, by the state, or by the court, may lawfully increase the period of time allowed:

The time within which an accused must be brought to trial, or, in the case of felony, to preliminary hearing and trial, may be extended only by the following:

(A)  Any period during which the accused is unavailable for hearing or trial, by reason of other criminal proceedings against him * * *

(B)  Any period during which the accused is mentally incompetent to stand trial or during which his mental competence to stand trial is being determined, or any period during which the accused is physically incapable of standing trial;

(C)  Any period of delay necessitated by the accused's lack of counsel, provided that such delay is not occasioned by any lack of diligence in providing counsel to an indigent accused upon his request as required by law;

(D)  Any period of delay occasioned by the neglect or improper act of the accused;

(E)  Any period of delay necessitated by reason of a plea in bar or abatement, motion, proceeding, or action made or instituted by the accused;

* * *

(H)   The period of any continuance granted on the accused's own motion, and the period of any reasonable continuance granted other than upon the accused's own motion. * * *

R.C. 2945.72(A)-(H).  In addition to motions by the accused and motions by the state for continuance, a trial court's *sua sponte* continuance will toll the speedy trial clock, but any "*sua sponte* continuance must be reasonable, and must be accompanied by a journal entry which is made prior to the expiration of the statutory time limit and explains the reasons for the continuance."  *State v. King*, 70 Ohio St.3d 158, 160, 637 N.E.2d 903 (1994) (reaffirming *State v. Mincy*, 2 Ohio St.3d 6, 441 N.E.2d 571 (1982).  When other actions by the accused cause a delay, courts have also charged the delay against the accused and tolled the speedy trial clock.  *Id.*  In each instance the amount of time must be reasonable.

{¶15} The constitutional and statutory speedy trial rights are coextensive. The tolling provisions in the statute operate to toll both rights, the right may also be waived.  An explicit waiver of either the constitutional or the statutory speedy trial right is a waiver of both rights under the law.  *King*, *supra*.  "To be effective, an accused's waiver of his or her constitutional and statutory rights to a speedy trial must be expressed in writing or made in open court on the record."  *Id.* at syllabus. An accused's waiver of speedy trial rights must also be knowing and voluntary; however, speedy trial rights can also be waived by counsel for the accused, even without the accused's consent for the purposes of trial preparation.  *State v. Dubose*, 174 Ohio App.3d 637, 884 N.E.2d 75 (2007), citing *State v. McBreen*, 54 Ohio St.2d

315, 320, 376 N.E.2d 593 (1978) and *State v. Taylor*, 98 Ohio St.3d 27, 2002-Ohio-7017, ¶33. The "trial court may reasonably rely upon the written waiver of speedy trial as filed within the case." *State v. O'Brien*, 34 Ohio St.3d 7, 10, 516 N.E.2d 218 (1987). In order to revoke a valid speedy trial waiver, a defendant must "formally inform the court of an objection to a further continuance" and of "a reassertion of the defendant's right to a speedy trial." *Id.* at 9-10.

**{¶16}** Appellant agreed to an unlimited and irrevocable waiver of his speedy trial right on December 11, 2009 during what would have been the final pre-trial hearing before his original trial date, December 14, 2009. The waiver reads:

> I, Charles Hudson, the above named Defendant in the above case number(s) and charged with the crime(s) of Rape, 2 counts of Kidnapping and Gross Sexual Imposition Ohio Revised Code Section 2907.01(A)(2)(B), 2905.01(A)(4)(c), 2905.01 (A)(2)(c) & 2907.05(A)(1)(c) being represented by counsel and having been advised of my constitutional and statutory right to a speedy trial * * * hereby irrevocably waive my right to a speedy trial and request an indefinite continuance of the trial of the same.

(12/11/09 Waiver.)

**{¶17}** "Trial date to be set" also appears on the entry. The document was signed by the prosecutor, defense counsel, Appellant, and the judge. A journal entry from the same date, filed on December 14, 2009, states: "Case called for pretrial. Counsel for both parties present. Defense counsel to file motions. Supplemental

discovery to be provided to defense counsel. Defendant waived speedy trial. Jury trial set for Monday, December 14, 2009 is hereby continued." (12/14/09 J.E.) The waiver was executed and journalized on the sixtieth day following Appellant's October 12, 2009 arrest. Regardless of whether Appellant actually signed the waiver, and the uncontradicted material in the record indicates that he did, the signature of his counsel, who needed to file additional motions and receive supplemental discovery prior to trial, was sufficient to waive Appellant's speedy trial rights. *King*, *supra*; *McBreen*, *supra*, paragraph one of the syllabus.

**{¶18}** The waiver executed by counsel and Appellant was for an indefinite term and, according to its terms, could not be withdrawn. Where, as here, there is a valid written speedy trial waiver of indefinite duration, any discussion of statutory tolling events is relevant only to the timeliness of the waiver. Because the waiver was executed on the sixtieth day following Appellant's arrest, even without accounting for any pre-waiver tolling event, it is clear that the waiver was timely. Because the waiver was timely and of indefinite duration, the next question is whether and when the waiver was withdrawn.

**{¶19}** The revocation of a speedy trial waiver must meet specific requirements. The revocation must be in writing; clearly indicate the intent to revoke waiver; object to further continuances; and include a demand for trial. *State v. Bandy*, 7th Dist. No. 05-MA-49, 2007-Ohio-859 and *State v. Love*, 7th Dist. No. 02 CA 245, 2009-Ohio-1762. The clear intent to revoke a waiver, without a trial demand is not a valid revocation. *Bandy*, *supra*. Similarly, a verbal objection made to a

prosecutor is not revocation. *Taylor*, *supra*. Appellant asserted in his October 15, 2010 motion to dismiss, and again on appeal, that his July 9, 2010 *pro se* letter to the court dismissing counsel constituted a withdrawal of his speedy trial waiver.

**{¶20}** Appellant's July 9, 2010 letter was addressed to the "Clerk of Common Pleas Court" and did not include a formal objection or a demand for trial. In this letter, Appellant informed the clerk that he was "discharge[ing]" his counsel. He indicated that the continuance counsel had requested was no longer needed, asked that the clerk "make an immediate court date" and requested that the court hold a hearing "under section 2937.21 (Continuance)." Appellant's July 9 *pro se* letter did not formally (or informally) object to future continuances, demand trial, or reassert a speedy trial right. Instead, Appellant merely informed the clerk that he discharged counsel and was requesting a hearing.

**{¶21}** The statute cited by Appellant, R.C. 2937.21, reads: "No continuance at any stage of the proceeding, including that for determination of a motion, shall extend for more than ten days unless both the state and the accused consent thereto. Any continuance or delay in ruling contrary to the provisions of this section shall, unless procured by defendant or his counsel, be grounds for discharge of the defendant forthwith." The section does not provide for a hearing and has "no application in a court of common pleas." *State v. Martin*, 56 Ohio St.2d 289, 384 N.E.2d 239 (1978). Appellant's July 9 *pro se* letter was not addressed to the court, did not object to further continuances, and did not include a demand for trial. Hence, it does not operate as a revocation of Appellant's speedy trial waiver.

**{¶22}** On appeal, Appellant alleges a *prima facie* speedy trial violation because "over 513 days" elapsed between arrest and trial, triggering the state's burden to demonstrate proper tolling of R.C. 2945.71 requirements. (Appellant's Brf., p. 15.) Appellant alleges that he did not sign the speedy trial waiver contained in the record, and contends in the alternative that he unequivocally withdrew his waiver in the letter dated July 9, 2010. Although Appellant argues that he was not brought to trial within a reasonable time after withdrawing his waiver, he focuses his argument on challenging the existence of sufficient tolling events to justify the lapse of time between arrest and trial. He does not address the reasonableness of the proceedings once he entered his waiver. While the existence of tolling events is relevant to a pre-waiver statutory speedy trial claim, they no longer control our analysis where waiver is waived. In this instance, Appellant has failed to demonstrate the absence of a valid waiver or his withdrawal of that valid waiver prior to the November 3, 2010 agreement setting a February 2011 trial date.

**{¶23}** Appellant's motion for dismissal based on speedy trial rights was not predicated on Appellant's final handwritten letter to the court, journalized on November 3, 2010. This letter, dated April 15, 2010 and addressed to the court, states: "It has come to my attention, that my attorney * * * has file [sic] a waiver of speedy trial rights. Well I now, on April 15, 2010. [sic] File a written, formal objection and demand for trial." (11/3/10 Letter.) Appellant concludes the letter "I * * * knowlingly and [i]ntelightly [sic] make an [sic] formal Objection to File waiver of

speedy rights and Ask, No I demand A trial within a reasonable time." (11/3/10 Letter.)

**{¶24}** There is nothing in the record to indicate that this letter was received by the court before November 3, 2010, even though it contains the date of April 15, 2010. On November 3, 2010, the same day the court received the letter, the parties agreed to a February 28, 2011 trial date, stating that it was "the next available trial date for the court and all parties." (11/4/10 J.E.) Appellant's November 3, 2010 *pro se* letter to the court and his October 15, 2010 motion to dismiss allege differing defects in the speedy trial waiver executed by Appellant on December 11, 2009. However, no affidavit, transcript, or other evidentiary material was placed in the record in support of these allegations.

**{¶25}** Appellant's November 3, 2010 letter does amount to a withdrawal of his speedy trial waiver pursuant to *O'Brien*, and triggers the requirement that the state "bring the accused to trial within a reasonable time." *Id.*, paragraph two of the syllabus. The state satisfied this requirement that same day when, according to a judgment entry dated November 3, 2010 (and journalized November 4, 2010), "upon agreement of the parties, the jury trial set for 11/8/10 is hereby continued. Final pretrial is set for 12/15/10 @ 1:30 pm. Jury trial is set for February 28, 2011 which is the next available trial date for the court and all parties." (11/4/10 J.E.)

**{¶26}** When a party agrees to a trial date beyond the ninety-day speedy trial limit, the extension is treated in the same manner as a continuance. *State v. Cutcher*, 56 Ohio St.2d 383, 384 N.E.2d 275 (1978) "the trial court has the discretion

to extend the time limits of R.C. 2945.71 when counsel for the accused agrees to a trial date beyond the statutory time limits" and trial court's "exercise of that discretion constitutes a 'continuance granted other than upon the accused's own motion' under R.C. 2945.72(H)." *Id.* at 385 quoting *State v. Davis*, 46 Ohio St.2d 444, 349 N.E.2d 315 (1976). Under the circumstances as evidenced in this record, a valid speedy trial waiver was entered on December 11, 2009 and withdrawn on November 3, 2010. The same day waiver was withdrawn, February 28, 2011 was agreed upon as the earliest date both parties and the court were available for trial. Trial commenced as scheduled without the renewal of a speedy trial objection. Trial by an agreement of the parties on the first date the parties and the court are available after the withdrawal of a valid indefinite speedy trial waiver is reasonable under the circumstances and complies with the requirements of *O'Brien*. Assuming *arguendo* that Appellant had submitted a prior valid withdrawal of his waiver, if the waiver itself was defective, or continuances granted after the waiver were unreasonable, Appellant's agreement to a trial date and decision not to renew any speedy trial objection prior to the commencement of trial on the agreed date waives any argument on these points for the purposes of this appeal. *Cutcher*, *supra*.

**{¶27}** For the reasons stated above, Appellant's first assignment of error is without merit and is overruled.

### Second Assignment of Error

THE TRIAL COURT FAILED TO TREAT THE GROSS SEXUAL IMPOSITION, RAPE AND KIDNAPPING CONVICTIONS AS ALLIED

OFFENSES OF SIMILAR IMPORT AND MERGE THEM AT THE SENTENCING HEARING.

**{¶28}** Appellant contends that we should ignore current merger law and apply an earlier version of merger formerly used only where a kidnapping charge was incidental to a rape charge. Appellant's argument quotes material concerning analysis of the connection between kidnapping and rape, and contends that the same analysis should control the relationship between rape and gross sexual imposition. Appellant advocates an interpretation of merger law that would permit an offender to commit multiple crimes with impunity merely because he or she was able to move quickly enough from one violation to the next while committing these crimes in close physical proximity to one another. This is not the intent of the law regarding merger.

**{¶29}** Merger is intended "to prevent shotgun convictions, that is, multiple findings of guilt and corresponding punishments" for "offenses arising from the same occurrence." *State v. Johnson*, 128 Ohio St.3d 153, 2010-Ohio-6314, 942 N.E.2d 1061, ¶43. Although all of the acts that led to Appellant's conviction occurred on the same morning, and some of the conduct that resulted in separate convictions occurred on the same floor of an abandoned house, the proximity of these acts in space and time does not change the fact that each conviction was based on separate conduct and for that reason are not allied offenses within the meaning of R.C. 2941.25 and *Johnson*.

**{¶30}** The law pertaining to allied offenses in Ohio is continually evolving, however, as we have recently considered at length in *State v. Helms*, 7th Dist. No. 08 MA 199, 2012-Ohio-1147 and *State v. Gilbert* 7th Dist. No. 08 MA 206, 2012-Ohio-1165, the Supreme Court's plurality decision in *Johnson, supra*, is the standard currently applied by all Ohio district courts that have considered the issue.  "Allied offenses of similar import" are defined by R.C. 2941.25, which provides:

(A)   Where the same conduct by defendant can be construed to constitute two or more allied offenses of similar import, the indictment or information may contain counts for all such offenses, but the defendant may be convicted of only one.

(B)   Where defendant's conduct constitutes two or more offenses of dissimilar import, or where his conduct results in two or more offenses of the same or similar kind committed separately or with a separate animus as to each, the indictment or information may contain counts for all such offenses, and the defendant may be convicted of all of them.

**{¶31}** Under *Johnson*, a trial or reviewing court is to determine whether the "offenses are allied offenses of similar import" by applying two stages of analysis. *Johnson, supra*, ¶48.  A court begins this inquiry by asking "whether the offenses were committed by the same conduct," and continues to ask "whether it is possible to commit one offense *and* commit the other with the same conduct" but not "whether it is possible to commit one *without* committing the other."  (Emphasis sic.)  *Id.* at ¶47-48.  If the answer to both questions is yes, the "offenses correspond to such a degree

that the conduct of the defendant constituting commission of one offense constitutes commission of the other, then the offenses are of similar import." *Id.* at ¶48. If, on the other hand, "the court determines that the commission of one offense will *never* result in the commission of the other," then the offenses are not allied and do not merge. (Emphasis sic.) *Id.* at ¶51.

**{¶32}** Even if a court identifies offenses of similar import, it must then consider whether the offenses were committed separately, or if the defendant had separate animus for each offense. *Id.* If the offenses were committed separately, or if there was separate animus for each, they remain separate for sentencing purposes. *Id.* Because the allied offense test is both case and fact specific, it "may result in varying results for the same set of offenses in different cases." *Id.* at ¶52. An "appellate court reviews the legal conclusion of whether the offenses are allied using a de novo standard, but because the trial judge is the fact-finder, the trial court's determinations as to the facts are not reviewable de novo." *State v. Williams*, 134 Ohio St.3d 482, 2012-Ohio-5699, 983 N.E.2d 1245, ¶30. "In fact, the appellate court should defer to the factual findings of the trial court, provided they are supported by some competent, credible[,] evidence." *Id.*

**{¶33}** Appellant was convicted on four counts: one count of rape, a violation of R.C. 2907.02(A)(2); two counts of kidnapping in violation of R.C. 2905.01, (A)(2) and (A)(4), and one count of gross sexual imposition, a violation of R.C. 2907.05(A)(1). Rape is a violation of R.C. 2907.02(A)(2) which provides: "No person shall engage in sexual conduct with another when the offender purposely compels

the other person to submit by force or threat of force." Sexual conduct is defined by R.C. 2907.01(A) as:

> [V]aginal intercourse between a male and female; anal intercourse, fellatio, and cunnilingus between persons regardless of sex; and, without privilege to do so, the insertion, however slight, of any part of the body or any instrument, apparatus, or other object into the vaginal or anal opening of another. Penetration, however slight, is sufficient to complete vaginal or anal intercourse.

**{¶34}** Gross sexual imposition is a violation of R.C. 2907.05(A), which provides:

> No person shall have sexual contact with another, not the spouse of the offender; cause another, not the spouse of the offender, to have sexual contact with the offender; or cause two or more other persons to have sexual contact when any of the following applies:
>
> (1) The offender purposely compels the other person, or one of the other persons, to submit by force or threat of force.

**{¶35}** "Sexual contact" is defined by R.C. 2907.01(B) as "any touching of an erogenous zone of another, including without limitation the thigh, genitals, buttock, pubic region, or, if the person is a female, a breast, for the purpose of sexually arousing or gratifying either person." Finally, kidnapping is a violation of R.C. 2905.01(A), which provides:

No person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:

* * *

(2)  To facilitate the commission of any felony or flight thereafter;

[AND]

(4)  To engage in sexual activity, as defined in section 2907.01 of the Revised Code, with the victim against the victim's will[.]

Each statute defines a different criminal act.  R.C. 2907.02(A)(2) defines and penalizes sexual *conduct*, which is separate and distinct from sexual *contact*, which is addressed by R.C. 2907.05(A)(1).  Kidnapping, on the other hand is a restraint on the liberty of another.  R.C. 2905.01.  As the trial court noted, a conviction for gross sexual imposition "does not in and of itself convict one of the charge of rape." (Sentencing Hrg. Tr., pp. 6-7.)

{¶36} Appellant contends that rape and kidnapping charges "are routinely found to be allied offenses."  (Appellant's Brf., p. 24.)  He extrapolates that to essentially state that they are always allied offenses.  Appellant overstates the law with regard to rape and kidnapping.  While rape inherently involves a restraint on the liberty of another, and where the act of rape, itself, is the sole unlawful exercise of restraint on the physical liberty of another person, the law is clear that any accompanying kidnapping charge should merge with the rape charge.  Although rape

inherently contains an unlawful restraint on liberty which constitutes kidnapping, the circumstances of the offense is determinative with regard to merger. *State v. Logan*, 60 Ohio St.2d 126, 397 N.E.2d 1345 (1979). The *Logan* Court emphasized that "[s]ecret confinement, such as in an abandoned building or nontrafficked area" may support a conviction for kidnapping apart from the commission of an underlying offense." *Id.* at 135. Similarly, "prolonged restraint without asportation * * * will support a conviction for kidnapping as a separate act or animus from that of rape." *Id.* at 134-135. According to the *Logan* Court, the "primary issue * * * is whether the restraint or movement of the victim is merely incidental to a separate underlying crime or, instead, whether it has a significance independent of the other offense." *Id.*

{¶37} According to *Logan*, even if the offense occurs at a "stand-still" a kidnapping charge, conviction, and sentence may still be appropriate; but in many instances the two crimes will merge. *Id.* The facts in this record reflect more than the slight relocation the *Logan* Court rejected; they resulted in a complete removal to the type of location the *Logan* Court singled out that clearly supports a separate kidnapping charge, even in the absence of relocation. *Id.* at 135. The record reflects that Appellant was sentenced for restraining the victim at knifepoint and forcing her across a parking lot to the second floor of an abandoned house, not merely for the physical restraint of the victim, holding her down, that necessarily occurs during a forced sexual encounter that results in rape or gross sexual imposition. (Tr. Vol. II, pp. 333-340, 383, 534.) The factual circumstances in this case support the trial court's conclusion that the kidnapping charge was not an allied offense of the rape.

Each conviction was based on separate acts. Appellant's kidnapping conviction should not merge with either his rape or gross sexual imposition convictions. A separate sentence for kidnapping is supported in this record and was lawful. *Johnson*, *supra*, ¶47 and *Logan*, *supra*, 135.

**{¶38}** With regard to his convictions for gross sexual imposition and rape, the trial court again concluded at sentencing that each offense was the result of separate conduct, which, under *Johnson*, means the two counts should not merge for sentencing purposes. *Johnson*, *supra*, ¶49. At sentencing, the state cited to the following conduct that formed the basis of Appellant's gross sexual imposition conviction: Appellant forced M into the house and up the stairs, M asked him to release her. Appellant refused and forced his tongue into her mouth. M asked him to stop. Appellant refused, and continued to force his tongue into her mouth, kissing her. Throughout this encounter he was holding the knife.

**{¶39}** According to the record here, Appellant then moved M across the room to a blanket on the floor under the window. Once Appellant had moved M across the room he took her shirt off and forced her to lie down on the floor. He proceeded to remove her pants and underwear, place the knife within reach, touched her thigh, and assaulted her vaginally. Appellant was charged with rape for this latter conduct. The trial court concluded "the charge and conviction of gross sexual imposition and rape do not merge, one dealing with the conduct, one dealing with the contact. The facts and elements indicate to me that they are separate." (Sentencing Hrg. Tr., p. 23.)

**{¶40}** Appellant does not conduct the analysis of gross sexual imposition and rape required by *Johnson*, or address the trial court's findings at sentencing. Instead, Appellant argues that we should apply a variant of the merger analysis conducted by the Ohio Supreme Court in that Court's 1979 *Logan* decision. Every decision Appellant cites for his proposition either pre-dates or does not apply *Johnson* and addresses the merger of kidnapping with other offenses, not the merger of gross sexual imposition with rape. Appellant also ignores the fact that various courts both pre and post-*Johnson* have declined to merge gross sexual imposition convictions with rape convictions, even when the offenses were essentially simultaneous, where different acts underlie each conviction (bearing in mind that gross sexual imposition may be a lesser included offense of rape when the only fact supporting the crime charged is the alleged penetration). *See, e.g.*, *State v. Reid*, 8th Dist. No. 83206, 2004-Ohio-2018; *State v. Brown*, 12 Ohio St.3d 147, 465 N.E.2d 889 (1984); *State v. Butts*, 9th Dist. No. 24517, 2009-Ohio-6430.

**{¶41}** While Appellant's argument is not legally accurate, even if we were to ignore *Johnson* and instead apply *Logan* to the facts of this case, the trial court's result is correct, because the convictions are based on separate acts. *Logan* does not yield the result Appellant advocates; the Ohio Supreme Court, when citing *Logan*, has previously rejected similar merger arguments. *State v. Foust*, 105 Ohio St.3d 137, 2004-Ohio-7006, 823 N.E.2d 836. The trial court found distinct factual bases for each conviction and the record supports that it properly applied the relevant law. Appellant's second assignment of error is without merit and is overruled.

<u>Third Assignment of Error</u>

THE TRIAL COURT ERRED IN FAILING TO SUPPRESS THE RESULTS OF THE UNDULY SUGGESTIVE PHOTO ARRAY.

**{¶42}** A trial court's decision on a motion to suppress will not be disturbed when it is supported by substantial credible evidence. *State v. Johnson*, 137 Ohio App.3d 847, 850, 739 N.E.2d 1249 (2000). We accept the trial court's factual findings and rely on the court's ability to assess the witness's credibility, but must independently determine, without deference to the trial court, whether the court applied the appropriate legal standard. *Burnside, supra,* at ¶8, citing *State v. McNamara*, 124 Ohio App.3d 706, 707 N.E.2d 539 (1997). Our review is limited to determining whether the trial court's findings are supported by competent, credible evidence. *State v. Burnside,* 100 Ohio St.3d 152, 2003-Ohio-5372, 797 N.E.2d 71, at ¶8 citing *State v. Fanning*, 1 Ohio St.3d 19, 437 N.E.2d 583 (1982). Review is limited because "[i]n a hearing on a motion to suppress evidence, the trial court assumes the role of trier of fact and is in the best position to resolve questions of fact and evaluate the credibility of witnesses." *State v. Venham*, 96 Ohio App.3d 649, 653, 645 N.E.2d 831 (1994).

**{¶43}** The United States Supreme Court specified factors to consider when evaluating the constitutionality of a pre-trial identification in *U.S. v. Wade,* 388 U.S. 218, 241, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967). They are: the prior opportunity of the witness to observe the alleged criminal act; the existence of any discrepancy between the pre-lineup description and the defendant's actual description; any

identification prior to the lineup of another person; identification by photograph of the defendant prior to the lineup; failure to identify the defendant on a prior occasion; and the lapse of time between the alleged act and the lineup identification. *Id.* While the "due process clause of the Fifth and Fourteenth Amendments forbids a lineup that is unnecessarily suggestive and conducive to irreparable mistaken identification," "[a] defendant in a lineup need not be surrounded by people nearly identical in appearance." *State v. Sheardon*, 31 Ohio St.2d 20, 285 N.E.2d 335 (1972) paragraph two of the syllabus; *State v. Davis*, 76 Ohio St.3d 107, 112, 666 N.E.2d 1099 (1996).

{¶44} In addition, in evaluating the suggestiveness of the line-up the court must also consider "the central question, whether under the 'totality of the circumstances' the identification was reliable even though the confrontation procedure was suggestive." *Neil v. Biggers*, 409 U.S. 188, 199 (1972). To determine the reliability of the identification, the factors to consider "include the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of the witness' prior description of the criminal, the level of certainty demonstrated by the witness at the confrontation, and the length of time between the crime and the confrontation." *Id.* at 199-200. In *Biggers*, the United States Supreme Court concluded that the court had focused unduly on the "relative reliability of a lineup as opposed to a showup," and as a result reached conclusions on the "critical facts" that were "unsupported by the record and clearly erroneous." *Id.* at 200. The Supreme Court listed the critical facts in that record, and they are similar

to the scenario in the matter at bar, a rape after the forced relocation of the victim to a secluded location:

> The victim spent a considerable period of time with her assailant, up to half an hour. She was with him under adequate artificial light in her house and under a full moon outdoors, and at least twice, once in the house and later in the woods, faced him directly and intimately. She was no casual observer, but rather the victim of one of the most personally humiliating of all crimes. Her description to the police, which included the assailant's approximate age, height, weight, complexion, skin texture, build, and voice, might not have satisfied Proust but was more than ordinarily thorough. She had "no doubt" that respondent was the person who raped her. In the nature of the crime, there are rarely witnesses to a rape other than the victim, who often has a limited opportunity of observation. The victim here, a practical nurse by profession, had an unusual opportunity to observe and identify her assailant.

*Id.* at 200-201. The Supreme Court concluded, based on the above facts, that despite any suggestiveness in the showup the identification was reliable. As a result, there was "no substantial likelihood of misidentification." *Id.*

**{¶45}** The witness in this matter was not a practical nurse, but this fourteen-year-old school-girl was nevertheless able to describe Appellant's relative age, height, complexion, walk, and facial features. She was taken at knifepoint at seven in

the morning and forced to accompany her assailant across a parking lot and into an abandoned house, before he forced his tongue into her mouth and then moved her across the room to engage in "one of the most personally humiliating of all crimes." *Id.* at 200. Under the circumstances, she had more than adequate light by which to observe her assailant, an extended period of time in which to do so, and an obvious and traumatic reason to remember. She was shown the photo array the same day, and burst into tears when she reached Appellant's photo. She has never wavered in her identification of Appellant and has never identified any other individual as her assailant. Appellant himself has admitted sexual contact and conduct occurred with the victim that morning, as described. He only denies the forcible nature of the encounter. Under these circumstances it is impossible to conclude that any alleged suggestiveness in the photo array created a substantial likelihood of misidentification.

**{¶46}** At the suppression hearing, in response to defense counsel's questions, the detective explained that the composition of the array began with "two possible suspects." (Suppression Hrg. Tr., p. 27.) In addition to the two suspects, the detective filled the array with individuals who matched the victim's description and were also residents of the area, because logically, the individual involved was familiar with "the area," knew "that home was abandoned," and that "school was happening that morning." (Suppression Hrg. Tr., p. 27.) The detective also explained, "I'm 38, so I could look 40 to 59 to a 14-year-old, so I wanted to key into people it could have been." (Suppression Hrg. Tr., p. 27.) To this end, the detective selected the remaining images in the array, a number of whom, like Appellant, had facial hair,

were local, appeared to be within the age range, and had prior criminal contacts with police. Appellant did not introduce the array into evidence at trial or in the record prior to trial. On appeal, our review is necessarily restricted to the trial court's assessment of the array, testimony concerning the array, and the applicable law.

**{¶47}** Appellant believes that he was the only individual in the array who appeared close to 60 and had gray hair, and that these differences made the photo array unduly suggestive. Appellant's argument actually relies on quotes of statements made by Appellant's counsel and the detective during the suppression hearing concerning their subjective assessments of the ages of the individuals, not on factual information of record concerning the actual ages of the individuals depicted. Appellant contends that the array should have been filled with individuals closer to 60 than to 40, regardless of the broader range provided by the victim.

**{¶48}** Appellant does not offer a legal basis for his belief that, to avoid being unduly suggestive, the array should skew to one end of the twenty year age range provided by the victim, nor does Appellant challenge the validity of the detective's impression of the fourteen-year-old victim's perception of age. Appellant does not allege any deficiency in the victim's opportunity to observe him relative to the crime. He does not suggest there was a significant lapse of time between the victim's observation of him while committing the crime and identifying him in the array in order to undermine the reliability of the identification. No prior or subsequent identification of another party by the witness appears in the record. Appellant concedes that he engaged in sexual conduct with the child that morning.

**{¶49}** Appellant does not address any part of the *Biggers* analysis other than to allege suggestiveness in the photo array. He in no way challenges the reliability of the identification. Appellant offers no legal basis for his assertion that the array should have been "double blind." Although Appellant argues that he is the only individual in the lineup who actually satisfied the victim's description of a taller, older, African American male with a distinctive walk and possible facial hair, between the ages of 40 and 59, the broad language of the description and the testimony elicited during the suppression hearing suggests otherwise. As the trial judge noted, walk and height cannot be discerned from the photographs used in the array; nothing in the description itself suggests that the lineup should, as Appellant alleges, have been made up solely of 60-year-old men. Appellant's third assignment of error is without merit and is overruled.

<u>Fourth Assignment of Error</u>

APPELLANTS CONVICTION FOR RAPE, GROSS SEXUAL IMPOSITION AND KIDNAPPING ARE AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.

**{¶50}** In determining whether a criminal judgment is against the manifest weight of the evidence, this Court acts as a "thirteenth juror" to determine whether, "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, 485 N.E.2d 717 (1983). The verdict is not against the weight of the

evidence when there is evidence which, if believed, will convince the average person of the accused's guilt beyond a reasonable doubt. *State v. Eley*, 56 Ohio St.2d 169, 172, 383 N.E.2d 132 (1978).

**{¶51}** The " '[w]eight of the evidence concerns "the inclination of the *greater amount of credible evidence*, offered in a trial, to support one side of the issue rather than the other. It indicates clearly to the jury that the party having the burden of proof will be entitled to their verdict, if, on weighing the evidence in their minds, they shall find the *greater amount of credible evidence* sustains the issue which is to be established before them. Weight is not a question of mathematics, but depends on its *effect in inducing belief*.'" (Emphasis sic.)" *State v. Barnhart*, 7th Dist. No. 09 JE 15, 2010-Ohio-3282, ¶24, quoting *Thompkins*, *supra*, at 387. The weight to be given the evidence and the credibility of the witnesses are primarily for the trier of fact to determine. *State v. DeHass*, 10 Ohio St.2d 230, 227 N.E.2d 212 (1967), paragraph one of the syllabus.

**{¶52}** Appellant alleges there were a variety of inconsistencies in the original witness statement and the victim's testimony at trial. Appellant contends that these inconsistences, which concern how clothing was removed, when the victim was able to leave the house, the extent to which the two moved through backyards or through the parking lot to the abandoned house, and the timeline of the morning's events, rendered the victim's testimony too incredible to support a verdict. Appellant argues that the alleged inconsistencies made his version of the events in which he claims the encounter was consensual, more credible than the victim's. Appellant concedes,

however, that questions of weight and credibility are primarily for the trier of fact. *DeHass*, *supra*, paragraph one of the syllabus.

{¶53} The substance of Appellant's argument actually concedes that the trier of fact heard relevant testimony on the elements of the offenses charged that was sufficient, if believed, to sustain a conviction. Appellant does not raise any gap in evidence or other deficiency that would indicate the evidentiary basis for his conviction was insufficient, he mainly challenges the weight the trier of fact gave to the victim's testimony. Again, as Appellant has acknowledged, questions of weight and credibility are resolved by the trier of fact. The trier of fact in this instance clearly found the victim more credible than it found Appellant. Appellant urges us to believe there were discrepancies in the victim's testimony that should lead us to conclude the encounter was consensual. Not only do we not find this to be the case, we note that there is evidence in the record that is inconsistent with Appellant's version of the events, including, but not limited to: the fact that the victim ran home crying, rather than continue on to school; the fact that the victim left her glasses behind when fleeing the house; the fact that the victim was so upset she was incoherent when trying to explain to her brother what had happened; and the victim's obvious distress hours later when she identified Appellant in the photo array. This record, then, does not support a conclusion that "the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *Thompkins*, *supra*, at 387. Appellant's fourth assignment of error is without merit and is overruled.

<u>Conclusion</u>

**{¶54}** A valid speedy trial waiver was entered in the record prior to the expiration of the R.C. 2945.72 deadline and a trial date was agreed to by all parties on the same day that Appellant's withdrawal of his waiver was entered in the record. Trial commenced as scheduled without the renewal of a motion to dismiss on speedy trial grounds. Appellant's two kidnapping convictions were properly merged by the trial court for sentencing purposes. The trial court found that Appellant's remaining kidnapping, gross sexual imposition, and rape convictions were based on separate acts. The court properly concluded that these remaining convictions did not merge for sentencing purposes. Appellant's pre-trial identification was reliable and was not induced by an impermissibly suggestive photo array procedure. Appellant's conviction was not against the sufficiency or the weight of the evidence. Appellants first, second, third and fourth assignments of error are overruled and the judgment of the trial court is affirmed.

Donofrio, J., concurs.

Vukovich, J., concurs.