[Cite as *State v. Clark*, 2016-Ohio-4561.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 103324**

**STATE OF OHIO**

PLAINTIFF-APPELLEE

vs.

**MOSES CLARK**

DEFENDANT-APPELLANT

**JUDGMENT:**
AFFIRMED

Criminal Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CR-15-592368-A

**BEFORE:** Jones, A.J., Boyle, J., and Celebrezze, J.

**RELEASED AND JOURNALIZED:** June 23, 2016

**ATTORNEYS FOR APPELLANT**

Russell S. Bensing
1360 East Ninth Street, Suite 600
Cleveland, Ohio 44135

Erin R. Flanagan
Erin R. Flanagan, Esq., L.T.D.
75 Public Square, Suite 1325
Cleveland, Ohio 44113


**ATTORNEYS FOR APPELLEE**

Timothy J. McGinty
Cuyahoga County Prosecutor

BY: Maxwell Martin
Assistant County Prosecutor
The Justice Center, 9th Floor
1200 Ontario Street
Cleveland, Ohio 44113

LARRY A. JONES, SR., A.J.:

{¶1} Defendant-appellant Moses Clark appeals his multiple convictions for rape and kidnapping with specifications.   We affirm.

**Procedural History and Facts**

{¶2} In 2015, Clark was charged with three counts of rape and three counts of kidnapping with sexual motivation specifications; the charges carried with them notices of prior convictions and one- and three-year firearm, repeat violent offender, and sexually violent offender specifications.   The matter proceeded to a jury trial, at which the following pertinent evidence was presented.

{¶3} In October 2006, 18-year-old "L.C." was walking near East 79th Street and St. Clair Avenue in Cleveland when a man pulled up in a car, flashed a black semi-automatic handgun, and told her to get in the car.   He threatened to shoot her if she did not comply.   L.C. did not know the man.

{¶4} L.C. got into the car, and the man drove to the back of a church.   The man made her get into the backseat of the car, take off her pants and underwear, and forced her to have vaginal intercourse.   The man ejaculated inside of her, wiped himself off with a tissue and threw the tissue outside the car window.   He told L.C. to get out of the car and count to 200.

{¶5} L.C. counted until the man drove away and then ran to a store for help.   She gave a description of her attacker to police.   L.C. was taken to the hospital and underwent a rape kit examination.   L.C. testified that she did not hear from the police again until 2015.   In court, she identified pictures of the crime scene, including the tissue the man used to wipe himself off and the clothes she wore that day.

{¶6} Retired nurse Karen Seguin ("Seguin") testified that she was a sexual assault nurse

examiner at MetroHealth for 30 years. She treated L.C. in October 2006. Seguin collected information from L.C. about the rape and documented the narrative within the medical record. Seguin noted that there was slight injury to the area of L.C.'s perineum, which was consistent with the assault described by L.C. She documented that L.C. was calm, cooperative, and confident in the accuracy of the details of the rape but also anxious and upset.

{¶7} "C.M." testified that she was 19 years old in October 2006 when she came home to Cleveland to visit family. She was walking home from the library when she noticed a car following her. A man, whom she did not know, was driving the car. A short time later, someone came up to her from behind, put something hard against her back, and said, "Get in the car, don't say nothing or I'm going to shoot you." The man led her to a car, which C.M. noticed as the same car that had been following her. The man, whom she thought to be around 40 years old, made her get in the car and drove to a church. She noted that he had a black gun.

{¶8} The man ordered C.M. to take her clothes off; she complied. The man told C.M. to "shut the f*** up" and that if she made any noise, he would shoot her. He got on top of her and had vaginal intercourse with her. After he ejaculated in her, he took a tissue, gave it to her to wipe herself, took the tissue back, and then told her to get out of his car and count to 100.

{¶9} C.M. counted to 10, called the police from her cell phone, and called a friend. A friend took her to the hospital where medical personnel recommended she undergo a rape kit examination. C.M. declined the physical exam but allowed medical personnel to take the shorts she had been wearing at the time of the attack. C.M. identified, in court, photographs of the shorts and crime scene.

{¶10} Eileen Dillon ("Dilllon") testified that she was a registered nurse at St. Vincent Medical Center and had worked there for 47 years. Dillon treated C.M. in October 2006.

Dillon documented the narrative of the sexual assault from what C.M. told her. She testified that C.M. declined to participate in a physical examination but allowed medical personnel to collect her clothing as evidence. Dillon observed that C.M. was tearful, anxious, emotionally upset, and complaining of vaginal pain.

{¶11} Cleveland Police Officer Martin Gray testified that, while on duty in October 2006, he responded to a house on Bellevue Avenue in Cleveland for a complaint of a rape that had just taken place. When he arrived, he encountered "C.S." and Ann Washington ("Washington"). He learned that the two women did not know each other, but that Washington had found C.S. walking down the street crying and brought her inside her house. C.S. was slumped over in a chair crying, and Washington was trying to comfort her.

{¶12} C.S. told Officer Gray that she was riding a bus and a man was making rude comments to her. She got off the bus, and the man followed her. The man, a black male in his thirties, pulled a handgun out of a bag. He pointed the gun at C.S. and made her get into a parked car. There was another male in the driver's seat of the car. The men drove C.S. to another location, where the driver forced her to have oral and vaginal intercourse. This male was approximately 40 years old and had a burn mark on his thigh. He did not wear a condom, and he ejaculated inside of her. After the assault, the men drove a short distance and kicked C.S. out of the car. C.S. ran across a field and down a street, where she encountered Washington.

{¶13} Michele Reali-Sorrell ("Reali-Sorrell") testified that she has been employed as a sexual assault nurse examiner since 2005. The nurse described the process of the rape kit examination and testified that her purpose in collecting and documenting the narrative of what the victim said happened to her or him is necessary to provide medical treatment to patients who

have been sexually assaulted. Reali-Sorrell recalled C.S. and treating her after the assault. Reali-Sorrell identified the medial record pertaining to C.S.'s treatment and noted that C.S. was 20 years old at the time of the assault.

{¶14} During her examination, C.S. complained of severe abdominal pain that she said was caused by a direct blow to that area. C.S. had a CT scan, which showed fluid in her abdomen. C.S. told the nurse her attacker threatened to kill her and grabbed, hit, and held her during the attack. During her time with C.S., Reali-Sorrell noted that the patient was tearful and soft-spoken. Reali-Sorrell further noted that the patient had a blood-tinged vaginal discharge.

{¶15} During her testimony, Reali-Sorrell read the following narrative taken from C.S.'s medical records:

> Patient states I got off the bus on 74th and St. Clair. I'm walking into Family Dollar parking lot, and this man kept talking to me walking behind me. He said, hey, hey, and pulled out a gun and said, b[***], you hear me. And then the other man pulled up the car and said, put her in the car. The man driving said this. The guy with the gun told me not to run and, b[***], get in the car.

> He opened the door and pushed me in the car and drove to a street called Addison. They were cussing me out, calling me a bitch and whore, and I ain't good for nothing. He kept saying he was going to shoot me. He went to abandoned — we went to an abandoned house on Addison. He made me suck his privates. He started to punch me because I wouldn't open my legs. I was screaming for help, telling him to get off me. The other guy was holding my hands behind my head. He pulled my pants down, and he did it to me.

> The other guy holding me down was laughing. Then the guy said, Oh, [***], I came at her. He threw my clothes at me and some tissue and told me to wipe my [***]. I did it. He told me — he took me to a field and told me to walk, don't turn around. The lady saw me crying and took me to her house and called the police.

{¶16} Washington testified that she lived on Bellevue Avenue in 2006. She was sitting

on her porch drinking coffee when she saw a girl, whom she did not know, walking down the street, crying. Washington asked the girl if she could help. According to Washington, although the girl was clearly upset, she spoke clearly, was neatly dressed, and was not intoxicated. The girl told Washington what had happened to her, and the police were called.

{¶17} Ken Riolo ("Riolo") testified that he was employed as an investigator with the Cuyahoga County Prosecutor's Office in the cold case unit. The office received a tip from the Bureau of Criminal Identification and Investigation ("BCI") that indicated that a common DNA profile in three victim's rape kits came from a single individual in the Cleveland area, Moses Clark. Riolo discovered that C.S. had died in April 2014; he located and interviewed the surviving victims.

{¶18} Riolo then located and interviewed Clark, who denied knowing any of the victims. Riolo showed Clark a photograph of each victim. Clark wrote "I don't know her" or "I don't recognize her" and initialed each of the victim's photos.

{¶19} Clark also denied any knowledge of the church where the rapes of L.C. and C.M. occurred and insisted he was at work when the rapes allegedly took place. Riolo collected buccal swabs from Clark to confirm the presence of his DNA in the rape kit evidence and personally dropped off the buccal swabs to BCI for testing.

{¶20} Riolo testified that he contacted Clark's employer at the time of the 2006 rapes, and the employer confirmed that Clark was not working when the attacks occurred.

{¶21} BCI forensic scientist Melissa Zielaskiewicz testified that Clark's DNA, collected by Riolo, was included in the sperm fraction of the DNA on both the vaginal samples and a portion of the napkin from L.C.'s rape kit. The expected frequency of occurrence of the DNA profile from the sperm fraction of the evidence was 1 in 164,200,000,000,000,000,000 (164

quintillion, 200 quadrillion) unrelated individuals. She also determined that Clark's DNA, collected by Riolo, was included in the sperm fraction of the DNA found on C.M.'s shorts with the expected frequency of occurrence of the DNA profile from the sperm fraction of the evidence was 1 in 7,018,000,000,000 (7 trillion, 18 billion) unrelated individuals. Finally, Zielaskiewicz determined that Clark's DNA, collected by Riolo, was included in the sperm fraction of the DNA on the vaginal samples from C.S.'s rape kit with the expected frequency of occurrence of the DNA profile from the sperm fraction of the evidence was 1 in 164,200,000,000,000,000,000 (164 quintillion, 200 quadrillion) unrelated individuals.

{¶22} The jury found Clark guilty of all counts: three counts each of rape with one- and three-year firearm specifications and kidnapping with one- and three-year firearm and sexual motivation specifications. The trial court convicted Clark of the notices of prior convictions and repeat violent offender and sexually violent offender specifications. The trial court determined that the rape and kidnapping offenses were not allied offenses of similar import and imposed a sentence of ten years to life on each of the rape and kidnapping counts with the rape counts to run consecutive to each other and the kidnapping counts to run concurrent. The trial court also imposed a three-year sentence on the firearm specifications, for a total sentence of 36 years to life. The court also classified Clark as a sexual predator.

**Assignments of Error**

> I: The trial court erred to Defendant's prejudice by entering a verdict against the manifest weight of the evidence, in derogation of Mr. Clark's right to due process of law under the Fourteenth Amendment of the United States Constitution and Article I, Section 16 of the Ohio Constitution.

> II: The trial court erred to Defendant's prejudice in admitting testimonial statements, without opportunity of cross-examination, in derogation of

Defendant's Right of Confrontation, as protected by the Fourteenth Amendment to the United States Constitution and Article I, Section 10 of the Ohio Constitution.

III: The trial court erred to Defendant's prejudice and committed plain error in admitting the patient narrative contained in the medical records of one of the alleged victims.

IV: The trial court erred to Defendant's prejudice through its denial of his motion for pre-indictment[sic] delay, in derogation of Defendant's right to Due Process of Law, as protected by the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

V: The trial court erred to Defendant's prejudice in its denial of Mr. Clark's motion for severance, in derogation of Defendant's right to Due Process of Law, as protected by the Fourteenth Amendment to the United States Constitution and Article I, Section 16 of the Ohio Constitution.

**Law and Analysis**

**1. Convictions were not against the manifest weight of the evidence**

{¶23} In the first assignment of error, Clark argues that his convictions were against the manifest weight of the evidence.

{¶24} In *State v. Wilson*, 113 Ohio St.3d 382, 2007-Ohio-2202, 865 N.E.2d 1264, the Ohio Supreme Court addressed the standard of review for a criminal manifest weight challenge, as follows:

The criminal manifest-weight-of-the-evidence standard was explained in *State v. Thompkins* (1997), 78 Ohio St.3d 380, 1997- Ohio-52, 678 N.E.2d 541. In *Thompkins*, the court distinguished between sufficiency of the evidence and manifest weight of the evidence, finding that these concepts differ both

qualitatively and quantitatively. *Id.* at 386, 678 N.E.2d 541. The court held that sufficiency of the evidence is a test of adequacy as to whether the evidence is legally sufficient to support a verdict as a matter of law, but weight of the evidence addresses the evidence's effect of inducing belief. *Id.* at 386-387, 678 N.E.2d 541. In other words, a reviewing court asks whose evidence is more persuasive — the state's or the defendant's? We went on to hold that although there may be sufficient evidence to support a judgment, it could nevertheless be against the manifest weight of the evidence. *Id.* at 387, 678 N.E.2d 541. "When a court of appeals reverses a judgment of a trial court on the basis that the verdict is against the weight of the evidence, the appellate court sits as a 'thirteenth juror' and disagrees with the factfinder's resolution of the conflicting testimony." *Id.* at 387, 678 N.E.2d 541, citing *Tibbs v. Florida* 457 U.S. 31, 42, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982).

*Id.* at ¶ 25.

{¶25} An appellate court may not merely substitute its view for that of the factfinder, but must find that "'in resolving conflicts in the evidence, the factfinder clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered.'" *State v. Walker*, 8th Dist. Cuyahoga No. 99239, 2013-Ohio-3522, ¶ 36, quoting *Thompkins* at 387. Accordingly, reversal on manifest weight grounds is reserved for the exceptional case where the evidence weighs heavily against the conviction. *Walker* at *id.* citing *Thompkins*.

{¶26} Clark argues that his convictions were based on the inconsistent testimony, and confused and incomplete memories of the two surviving victims, who could not even identify

him in court. Although we review credibility when considering the manifest weight of the evidence, we are cognizant that determinations regarding the credibility of witnesses and the weight of the testimony are primarily for the trier of fact. The trier of fact is best able "to view the witnesses and observe their demeanor, gestures, and voice inflections, and use these observations in weighing the credibility of the proffered testimony." *State v. Taylor*, 8th Dist. Cuyahoga No. 100315, 2014-Ohio-3134, ¶ 40, citing *State v. Kurtz*, 8th Dist. Cuyahoga No. 99103, 2013-Ohio-2999, ¶ 26. Although, the witnesses testified at times that they could not remember the events of the day, we are cognizant that the violent crimes against these young women occurred years prior to trial. The jury simply could have believed that, when L.C. and C.M. testified that they did not remember a detail about the attack, they were giving truthful answers.

{¶27} Clark told the prosecutor's investigator that he never met any of the victims, but on appeal, he does not mention the DNA evidence or explain how his DNA ended up inside of L.C.'s and C.S.'s vaginas and on C.M.'s shorts. Clearly, the DNA evidence was the most important piece of evidence in the trial. The DNA evidence established that only one of over 164 quintillion unrelated individuals would have the same DNA as the man who kidnapped and raped L.C., only one in over 7 trillion unrelated individuals would have the same DNA as the man who raped and kidnapped C.M., and only one in 164 quintillion unrelated individuals would have the same DNA as the man who kidnapped and raped C.S. Thus, the DNA evidence on its own strongly supported the jury's finding that Clark was the man who kidnapped and raped L.C., C.M., and C.S. *See State v. Bandy*, 7th Dist. Mahoning No. 05-MA-49, 2007-Ohio-859, ¶ 85 (DNA evidence alone overwhelmingly supported the conclusion that appellant was victim's attacker even though victim could not identify him).

**{¶28}** After independently reviewing the entire record and weighing the evidence and all reasonable inferences, including the credibility of the witnesses, we cannot say that the jury clearly lost its way and created such a manifest miscarriage of justice that the convictions must be reversed and a new trial ordered. Accordingly, we overrule the first assigned error.

## 2. Court did not err in allowing in hearsay statements

**{¶29}** We will discuss the second and third assignments of error together as they both involve statements entered into evidence that C.S., who was deceased at the time of trial, made to others.

### a. statements to police officer

**{¶30}** In the second assignment of error, Clark argues that the trial court erred in admitting the statements that C.S. made to Officer Martin Gray. During trial, Officer Gray testified that he was one of the police officers who first arrived on scene to Ann Washington's house, responding to a call that a female had just been raped. When he arrived, he found C.S. slumped over in a chair, upset and crying. At this point in Officer Gray's testimony, defense counsel objected, but the trial court overruled the objection. Officer Gray testified that C.S. told him that she was riding the RTA bus with a friend but decided to get off because a man was bothering her. The man also got off the bus, followed her, and pulled out a gun on her.

**{¶31}** Defense counsel objected again at this point, and the trial court expressed its concern that the state had not laid the proper foundation for admission of C.S.'s statement as an excited utterance exception to hearsay. Defense counsel argued that C.S.'s statements were not excited utterances and admission of her statements would violate Clark's right to confront witnesses within the meaning of *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct.1354, 158 L.Ed.2d 177 (2004). The trial court determined that C.S.'s statements were indeed excited

utterances and did not violate *Crawford*, because the officer's questioning was designed to address the emergency at hand.

**{¶32}** Officer Gray then testified that C.S. told him she was forced into a car where another man was waiting and the two men drove her to a white, boarded-up house. The driver, whose nickname was "Black," made C.S. perform oral sex on him and forced her to have vaginal sex. The man did not wear a condom and ejaculated inside of her. The men then drove her to another location and "kicked" her out of the car. She fled.

**{¶33}** C.S. described the man who raped her as a black male about 40 years old, six feet tall and approximately 215 pounds, with "salt and pepper" hair, and who was wearing work clothing, had a gold tooth, and had a burn mark on his thigh.

**{¶34}** We first consider whether C.S.'s statements were admissible as excited utterances. Under Ohio Evid.R. 803(2), otherwise inadmissible hearsay is admissible if it is a "statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." Excited utterances are considered trustworthy because they are made while the event is still fresh in the declarant's mind. *State v. Fields*, 8th Dist. Cuyahoga No. 88916, 2007-Ohio-5060, ¶ 51, citing *State v. Taylor*, 66 Ohio St.3d 295, 300, 612 N.E.2d 316 (1993). The statement must concern

> some occurrence startling enough to produce a nervous excitement in the declarant, which * * * the declarant had an opportunity to observe, and must be made before there had been time for such nervous excitement to lose domination over his [or her] reflective faculties.

*State v. McCree*, 8th Dist. Cuyahoga No. 87951, 2007-Ohio-268, ¶ 60.

**{¶35}** Officer Gray testified that C.S.'s statements to him were made as soon as he responded to the scene and within ten minutes of when the 911 call came into dispatch. Officer

Gray and Washington each testified that C.S. was crying and upset throughout the interview; Officer Gray testified that Washington had her open hand on C.S.'s back trying to comfort and calm her. Under these facts, the trial court did not abuse its discretion in finding that C.S.'s statements to Officer Gray fell within the "excited utterances" exception to the hearsay rule.

{¶36} Next, we determine whether Clark's right of confrontation was violated.

{¶37} In *Crawford*, the United States Supreme Court held that the Confrontation Clause bars the admission of "testimonial statements of witnesses absent from trial." *Id.,* 541 U.S. at 59,124 S.Ct. 1354, 158 L.Ed.2d 177. The court explained that "[w]here testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation." This means that the state may not introduce "testimonial" hearsay against a criminal defendant, regardless of whether such statements are deemed reliable, unless the defendant has an opportunity to cross-examine the declarant. *Id.* at 53-54, 68.

{¶38} In *Davis v. Washington*, 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the United States Supreme Court found that statements made with the "primary purpose" of enabling police to meet an "ongoing emergency" are not testimonial. *Id.* at 826. *Davis* identified four characteristics of a statement that meets the emergency exception: (1) the witness describes contemporaneous events rather than events that occurred hours earlier, (2) an objective emergency exists, (3) the questions are necessary to resolve the emergency, and (4) the interview is of an informal nature. *See id.* at 826-30.

{¶39} Here, the record shows that C.S.'s attackers dropped her off and she immediately fled through a field and down a street where Washington found her. A call was made to 911, and the police arrived minutes later and began to assess C.S.'s needs. Her attackers, one of

whom was armed, were unknown to her, and were still at large. C.S. had not yet been transported to the hospital. Therefore, when police arrived on scene, the situation was still very much ongoing.

{¶40} Under these circumstances, C.S.'s primary purpose in talking to the police officer was to receive assistance from him and the police officer's primary purpose was to assist C.S. Even though C.S.'s statements to Officer Gray may later be used in court, it cannot be said that Officer Gray was seeking to develop C.S.'s testimony about past events for a criminal proceeding. *See State v. Goshade*, 1st Dist. Hamilton No. C-120586, 2013-Ohio-4457, ¶ 17.

{¶41} Therefore, considering the totality of the circumstances, we find that C.S.'s statements were not testimonial and, therefore, the trial court did not err in allowing those statements into evidence under the excited utterance exception to the hearsay rule.

**b. medical records**

{¶42} In the third assignment of error, Clark argues that the trial court erred when it allowed the narrative from C.S.'s medical records into evidence. As an initial matter, we note that Clark did not object to the narrative being allowed into evidence; therefore, he has waived all but plain error. Pursuant to the terms of Crim.R. 52(B), plain errors or defects that affect substantial rights may be grounds for reversal even though they were not brought to the attention of the trial court. But "[n]otice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Long*, 53 Ohio St.2d 91, 372 N.E.2d 804 (1978), paragraph three of the syllabus.

{¶43} Pursuant to Evid.R. 803(4),

[s]tatements made for purposes of medical diagnosis or treatment and describing

medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment

are not hearsay.

{¶44}   In *State v. Stahl*, 111 Ohio St.3d 186, 2006-Ohio-5482, 855 N.E.2d 834, the Ohio Supreme Court considered whether hearsay statements by an adult rape victim to a nurse working in a specialized medical facility for sexual assault victims were admissible under the *Crawford* standard when the victim was not available to testify at trial. Applying the objective-witness test, the court found that the victim's statements were made to a medical professional at a medical facility for the primary purpose of receiving medical treatment and not investigating past events related to criminal prosecution. *Id.* at ¶ 25. The court held that the statements made by the rape victim to the nurse were nontestimonial because the victim "could have reasonably believed that although the examination conducted at the [sexual assault] unit would result in scientific evidence being extracted for prosecution purposes, the statement would be used primarily for health-care purposes." *Id.* at ¶ 47.

{¶45} In *State v. Muttart*, 116 Ohio St.3d 5, 2007-Ohio-5267, 875 N.E.2d 944, the Ohio Supreme Court held that the statements of a child victim of sexual assault made to doctors and counselors about how her father had sexually abused her were admissible because they had been made to medical personnel in the course of medical diagnosis and treatment. The court held that "[s]tatements made to medical personnel for purposes of diagnosis or treatment are not inadmissible under *Crawford*, because they are not even remotely related to the evils that the Confrontation Clause was designed to avoid." *Id.* at ¶ 63. The court also noted that "[t]he fact that the information gathered by the medical personnel in this case was subsequently used by the state does not change the fact that the statements were not made for the state's use." *Id.* at ¶ 62.

**{¶46}** In *State v. Echols*, 8th Dist. Cuyahoga No. 102504, 2015-Ohio-5138, this court found that a narrative from a deceased rape victim's medical record read during trial by the victim's treating physician was not testimonial because statements elicited during questioning by medical personnel for purposes of medical diagnosis and treatment are not barred from trial by the Confrontation Clause. *Id.* at ¶ 21, 26; *see also State v. Bowleg*, 8th Dist. Cuyahoga Nos. 100263 and 100264, 2014-Ohio-1433, ¶ 14-15. This court noted that "'[c]ourts have consistently found that a description of the encounter and identification of the perpetrator are within scope of statements for medical treatment and diagnosis.'" *Echols* at ¶ 27, quoting *In re D.L.*, 8th Dist. Cuyahoga No. 84643, 2005-Ohio-2320, ¶ 21.

**{¶47}** As with C.S., the victim in *Echols* died before trial. The victim's treating physician read a lengthy narrative into the record that included what she was doing before she was attacked and detailed circumstances of the attack. In this case, Reali-Sorrell testified that it was important to collect information about the assault to understand what happened to C.S., what her injuries might be, and to know how to treat her. Clark fails to point to any evidence, and we found none in our review of Reali-Sorrell's testimony, that shows that the nurse was collecting the information primarily to be used in later criminal proceedings. Thus, the trial court did not commit plain error when it allowed the nurse's testimony with regard to C.S.'s medical records into evidence pursuant to Evid.R. 803(4).

**{¶48}** In light of the above, we find that Clark's Sixth Amendment rights were not violated by Officer Gray's or nurse Reali-Sorrell's testimony and the trial court did not abuse its discretion in allowing the testimony into evidence.

**{¶49}** The second and third assignments of error are overruled.

**3. No preindictment delay**

**{¶50}** In the fourth assignment of error, Clark argues that the trial court erred in denying his motion to dismiss due to preindictment delay.   We disagree.

**{¶51}** "An unjustifiable delay between the commission of an offense and a defendant's indictment therefor, which results in actual prejudice to the defendant, is a violation of the right to due process of law[.]"   *State v. Luck*, 15 Ohio St.3d 150, 472 N.E.2d 1097 (1984), paragraph two of the syllabus.   A two-part test is applied in order to determine whether preindictment delay constitutes a due process violation.   *State v. Powell*, 8th Dist. Cuyahoga No. 102922, 2016-Ohio-1220, ¶ 12.   The defendant has the initial burden to show that he or she was substantially and actually prejudiced because of the delay.   *State v. Dixon*, 8th Dist. Cuyahoga No. 102335, 2015-Ohio-3144, 40 N.E.3d 601, ¶ 19, citing *State v. Whiting*, 84 Ohio St.3d 215, 217, 702 N.E.2d 1199 (1998).   If actual prejudice is demonstrated, the burden then shifts to the state to produce evidence of a justifiable reason for the delay.   *Powell* at *id.*, citing *Dixon* at *id.*   Decisions granting or denying a motion to dismiss for preindictment delay are reviewed for an abuse of discretion.   *State v. Owens*, 8th Dist. Cuyahoga No. 102276, 2015-Ohio-3881, ¶ 2, citing *State v. Darmond*, 135 Ohio St.3d 343, 2013-Ohio-966, 986 N.E.2d 971, ¶ 33.

**{¶52}** Clark cites this court's recent en banc in *State v. Jones*, 2015-Ohio-2853, 35 N.E.3d 606, ¶ 37 (8th Dist.), *appeal allowed*, 143 Ohio St.3d 1542, 2015-Ohio-4633, 40 N.E.3d 1179, to support his position that he was prejudiced by the delay in prosecution.   In *Jones*, almost 20 years passed before the state indicted the defendant on rape charges, even though the victim had immediately identified "Demetrius" as her attacker.   This court evaluated the actual prejudice prong of the two-part test in terms of basic concepts of due process and fundamental justice.   The court found that Jones "suffered actual prejudice" as the matter was one where the

state simply failed, or refused, to take action for a substantial period.  *Id.* at ¶ 56.

**{¶53}** This case is distinguishable from *Jones*.  First, the delay in prosecuting Jones was almost 20 years; in this case the delay was 8 years.  In *Jones*, Jones claimed an inability to offer evidence from his mother, deceased by the time of trial, who was in the house at the time of the incident rape and could have corroborated the defendant's claim that he and the victim were in a relationship and that there was no violent fight as described by the victim.  In addition, the defendant argued that the victim's clothing she wore on the night of the alleged offense had been destroyed, thus denying him the opportunity to examine it and undermine her claim that she and Jones engaged in a violent fight.  Unlike *Jones*, in this case there is no allegation of missing or destroyed evidence.  More importantly, perhaps, is that Clark's identity as the serial rapist was unknown until August 27, 2014, and he was indicted shortly thereafter on January 7, 2015, after an investigation and re-verification of the DNA matches.

**{¶54}** Clark claims that he was prejudiced by the death of C.S. and the other victim's foggy memories.  We consider the Ohio Supreme Court case of *State v. Adams*, 144 Ohio St.3d 429, 2015-Ohio-3954, 45 N.E.3d 127, in which the court stated that

> [t]he death of a potential witness during the preindictment period can constitute
>
> prejudice, but only if the defendant can identify exculpatory evidence that was lost
>
> and show that the exculpatory evidence could not be obtained by other means.

*Id.* at ¶ 103, citing *United States v. Rogers*, 118 F.3d 466, 475 (6th Cir.1997).  Clark has not identified any exculpatory evidence that has been lost, let alone show how that evidence could not be otherwise obtained.  *See also State v. Jones*, 8th Dist. Cuyahoga No. 102814, 2015-Ohio-5540, ¶ 10.  Moreover, the alleged lapses in the surviving victim's memories was based on their testimony at trial, which occurred after Clark's motion was denied.  "The law

requires a defendant to do more than offer mere speculation as to how he [or she] was prejudiced by any delay because requiring less would undermine the statute of limitations." *Owens*, 8th Dist. Cuyahoga No. 102276, 2015-Ohio-3881, at ¶ 5; *see also State v. Wilson*, 8th Dist. Cuyahoga No. 102921, 2016-Ohio-2718, ¶ 70, citing *State v. Thomas*, 8th Dist. Cuyahoga No. 101202, 2015-Ohio-415, ¶ 11 (This court has consistently held that speculation does not show actual prejudice.).

**{¶55}** Thus, the trial court did not err in denying Clark's motion to dismiss based on preindictment delay. The fourth assignment of error is overruled.

**4. Trial court did not err in denying motion to sever**

**{¶56}** In the fifth assignment of error, Clark claims he was prejudiced by the joinder of charges that were unrelated and should have been tried separately. Under Crim.R. 8(A), which governs the joinder of offenses, two or more offenses may be charged together if the offenses "are of the same or similar character, * * * or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct." Similarly, Crim.R. 13 provides that a trial court may order two or more indictments or informations, or both, to be tried together, "if the offenses or the defendants could have been joined in a single indictment or information."

**{¶57}** The law favors joining multiple offenses in a single trial if the requirements of Crim.R. 8(A) are satisfied. *State v. Lott*, 51 Ohio St.3d 160, 163, 555 N.E.2d 293 (1990); *State v. Ferrell*, 8th Dist. Cuyahoga No. 100659, 2014-Ohio-4377, ¶ 38. If it appears, however, that the defendant would be prejudiced by the joinder, a trial court may grant a severance. Crim.R. 14; *State v. Diar*, 120 Ohio St.3d 460, 2008-Ohio-6266, 900 N.E.2d 565, ¶ 95. The defendant bears the burden of proving prejudice. *State v. Brinkley*, 105 Ohio St.3d 231,

2005-Ohio-1507, 824 N.E.2d 959, ¶ 29.

{¶58} If a defendant claims that he or she will be prejudiced by the joinder of multiple offenses, the state may rebut that claim by showing that the evidence of each crime is simple and distinct ("joinder test") or evidence of other crimes would be admissible even if the counts were severed ("other acts test"). *Lott* at *id.* "A trier of fact is believed capable of segregating the proof on multiple charges when the evidence as to each of the charges is uncomplicated." *State v. Lunder*, 8th Dist. Cuyahoga No. 101223, 2014-Ohio-5341, ¶ 33, citing *State v. Torres*, 66 Ohio St.2d 340, 421 N.E.2d 1288 (1981). Joinder is therefore not prejudicial when the evidence is direct and uncomplicated and can reasonably be separated as to each offense. *Id.* citing *id.*

{¶59} If the state can meet the requirements of the "joinder test," it need not meet the requirements of the stricter "other acts test." *State v. Peterson*, 8th Dist. Cuyahoga Nos. 100897 and 100899, 2015-Ohio-1013, ¶ 66, citing *State v. Franklin*, 62 Ohio St.3d 118, 122, 580 N.E.2d 1 (1991). A defendant is therefore not prejudiced by joinder when simple and direct evidence exists, regardless of the admissibility of evidence of other crimes under Evid.R. 404(B). *Id.* citing *id.*[1]

{¶60} In this case, joinder was proper because each of the offenses was of similar nature and based on the same course of conduct. The attacks all occurred in October 2006. Two of the three rapes occurred in the parking lot of the same church. But each rape and kidnapping was entirely distinct in proof, each rape kit was analyzed separately, and none of the evidence

---

[1]Evid.R. 404(B) allows the admission of "other acts" evidence so long as it is "related to and shares common features with the crime in question." *State v. Lowe*, 69 Ohio St.3d 527, 634 N.E.2d 616 (1994), paragraph one of the syllabus. Specifically, evidence of other crimes, wrongs, or acts is admissible under Evid.R. 404(B) if the evidence shows "proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." But evidence of other crimes, wrong, or acts is inadmissible merely to show that an accused has the propensity to commit the crime or acted in conformity with a particular character trait. Evid.R. 404(B).

overlapped between the three incidents. Moreover, the evidence in each of the cases was simple and direct, and there is no indication in the record that the jury confused the evidence as to the different counts or that it was influenced by the cumulative effect of the joinder.

**{¶61}** Thus, the trial court did not err in joining the offenses. The fifth assignment of error is overruled.

**{¶62}** Judgment affirmed.

It is ordered that appellee recover of appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate issue out of this court directing the common pleas court to carry this judgment into execution. The defendant's conviction having been affirmed, any bail pending appeal is terminated. Case remanded to the trial court for execution of sentence.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____

LARRY A. JONES, SR., ADMINISTRATIVE JUDGE

MARY J. BOYLE, J., and
FRANK D. CELEBREZZE, JR., J., CONCUR